In re UNIVERSAL CLEARING HOUSE COMPANY, a Trust, aka National Clearing House Company, a Trust, Debtor.

In re INDEPENDENT CLEARING HOUSE COMPANY, a Trust, Debtor.

In re ACCOUNTING SERVICES COMPANY, a Trust, Debtor.

Robert D. MERRILL, Trustee, Plaintiff/Appellee,

v.

Thomas J. DIETZ, Defendant/Appellant.

Civ. No. C–85–0321W.
Bankruptcy Nos. 81–02887, 81–02886 and 81–03704.

United States District Court, Utah, C.D.

April 1, 1986.

Daniel W. Jackson, Salt Lake City, Utah, for defendant/appellant, Thomas J. Dietz.

William G. Fowler, Robert D. Merrill, Salt Lake City, Utah, for plaintiff/appellee and trustee, Robert D. Merrill.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on appeal from the United States Bankruptcy Court for the District of Utah. Oral argument was heard by the court on December 10, 1985. Daniel W. Jackson appeared on behalf of the appellant, Thomas J. Dietz ("Dietz"), and William G. Fowler appeared on behalf of the appellee and trustee, Robert D. Merrill ("Merrill"). Following argument, the court took the matter under advisement. After reviewing the record, the arguments of counsel and the pertinent authorities, the court now enters the following decision and order.

### Background

On September 23, 1983, the trustee of the above-referenced debtors filed the present action against appellant Dietz seeking an accounting and recovery of some of the debtors' funds allegedly diverted to Dietz by principals of the debtors. The United States Bankruptcy Court for the District of Utah, 41 B.R. 985, entered judgment in favor of the trustee and against Dietz in the sum of $65,000 with interest from the date of the filing of the complaint. The judgment was based on the bankruptcy court's conclusion that certain of the transfers were subject to avoidance under 11 U.S.C. § 544 and § 548 and that the

value of those transfers was recoverable from Dietz pursuant to 11 U.S.C. § 550.

## Facts

Appellee Merrill is the duly appointed and acting trustee of the related debtor entities, Universal Clearing House Company, Independent Clearing House Company, Accounting Services Company, Tonder Payable Service Company and Payable Accounting Company (the "Clearinghouses").[1] The stated business purpose of the Clearinghouses was to solicit funds from private investors, called "undertakers," and to use the invested funds to assume and pay the creditors of various client companies. In theory, the Clearinghouses would be able to pay off their clients' accounts payable at a discount by offering to pay the creditors before the accounts came due. The clients would then pay the Clearinghouses the full amount at a later date. The difference between the sums repaid by the clients and the discounted amounts the Clearinghouses paid the creditors would provide the undertakers with a handsome return on their investment. In fact, there were no client companies. Money from later investors was used to pay "interest" to earlier investors, creating the illusion that the companies were making money.

On September 16, 1981, Independent Clearing House Company and Universal Clearing House Company filed petitions for relief under chapter 11 of the Bankruptcy Code. Accounting Services Company filed a chapter 11 petition on December 17, 1981.[2] On September 25, 1981, the bankruptcy court appointed a trustee pursuant to 11 U.S.C. § 1104. On October 26, 1982, the original trustee resigned, and the court appointed Robert D. Merrill as successor trustee.

The trustee brought this adversary proceeding in order to recover funds of the debtors allegedly diverted to Dietz. The funds at issue in this appeal were transferred on five occasions. The first transfer occurred on or about January 6, 1981 when a cashier's check in the amount of $10,000 made payable to Thomas Dietz was purchased by Tonder Payable Company. Mr. Dietz received that $10,000. The next two transfers took place on or about April 20, 1981 and May 12, 1981 when Dietz received two checks, numbered 5 and 108, drawn on the account of LaPage Corporation, an entity which had received funds from the debtors. The other two occasions involved transfers of funds from the debtor companies to third parties which the trustee contended were made for the benefit of Dietz. The first of these involved check number 229 dated November 17, 1980. This check, drawn on the account of Baltimore Investments and made payable to Warren & Sommer was to be applied to the account of Thomas Dietz.[3] The second occurred on or about March 23, 1981 when check number 729 in the sum of $10,000 was drawn on the account of Accounting Services Company and paid to a Mr. Theadore Ayervais.

Dietz contends the evidence at trial established he was an innocent recipient of funds transferred to him by entities other than the debtors and also established he was unaware that the funds in question had originated from the debtors. He argues that because he gave value for the transfers, in good faith and without knowledge of the prior transfers from the debtors, he was entitled to the protections contained in 11 U.S.C. § 550(b)(1). Dietz alternately contends that the transfers he received are not avoidable under 11 U.S.C. § 548 because the debtors had no interest in the property transferred. Finally, he argues that the bankruptcy court abused

1. Accounting Services Company, Payable Accounting Company and Tonder Payable Service Company acted as related payable companies for Independent Clearing House and Universal Clearing House.

2. Orders for relief were later granted against Tonder Payable Service Company on April 29,

1982, and against Payable Accounting Company on August 16, 1982.

3. At trial, Dr. Ronald N. Bagley, the trustee's accountant, testified that approximately 90 to 95 percent of the funds of Baltimore Investments had their origin with the debtors.

its discretion in granting prejudgment interest to the trustee.

### "Property" of the Debtor

A trustee's powers to avoid prepetition transfers by the debtor are statutory, and the starting point in any case of statutory interpretation is the language of the statute itself. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). The relevant statutory language is contained in 11 U.S.C. §§ 544, 548. Section 548(a) allows the trustee to avoid "any transfer of an interest of the debtor in property" if the transfer meets certain conditions. Dietz contends that the transfers at issue here were not transfers of the debtors' "property" and thus could not be avoided under section 548. As a preliminary matter, we must therefore decide whether the money the trustee seeks to recover was "property" of the debtor. If it was not, the trustee had no statutory basis for recovering it.

■ Nowhere does the Code define "property of the debtor" or "an interest of the debtor in property." Therefore, we must resort to nonbankruptcy law to determine whether payments to the defendants were transfers of the debtors' "property." *See First Fed. Sav. & Loan Ass'n of Bimarck, Inc. v. Hulm (In re Hulm)*, 738 F.2d 323, 326 (8th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984); 4 *Collier on Bankruptcy* ¶ 541.02[1] at 541–10 to –11 (L. King 15th ed. 1985) ("the existence and nature of the debtor's interest in property ... are determined by nonbankruptcy law"). Since state law both creates and defines property interests, *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), we must look to state law to resolve the question.[4]

We note initially that the cases are unanimous, both under the old Bankruptcy Act of 1898, Pub. L. No. 62–57, 30 Stat. 544 (codified as amended primarily in former 11 U.S.C. (1976) and repealed in 1978), and under the Bankruptcy Reform Act of 1978, Pub. L. No. 95–598, 92 Stat. 2549 (codified as amended primarily in 11 U.S.C.A. § 1–1146 (1979 & Supp.1985) and scattered sections of 28 U.S.C.A. (1965–76 & Supp.1985)) ("the Code"), that the trustee in bankruptcy could recover as preferential and fraudulent transfers at least some of the payments that the debtor had made to investors in a Ponzi scheme. *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Henderson v. Allred (In re Western World Funding, Inc.)*, 54 B.R. 470 (Bankr.D.Nev.1985); *Lawless v. Anderson (In re Moore)*, 39 B.R. 571 (Bankr. M.D.Fla.1984). *See also Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980) (not a pure Ponzi scheme); *Edmondson v. Bradford-White Corp. (In re Tinnell Traffic Servs., Inc.)*, 41 B.R. 1018 (M.D.Tenn.1984) (fraudulent transaction).

Dietz argues that the prior cases are distinguishable from this since, under the state law applicable at the time, one who obtained possession of property had defeasible title to the property, even if he obtained it by tortious or criminal means. On

---

**4.** The question naturally arises as to which state's law is applicable. As a general rule, the law of the state in which the property is situated governs questions of property rights. *Johnson v. First Nat'l Bank of Montevideo, Minn.*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied*, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Here, the property (money transferred to the defendants by the debtors) was not all situated in one state but was spread throughout many western states. Under such circumstances, a court may not be free to simply apply the law of the forum state to all claims. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. ——, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). In this case, however, all the parties have treated Utah law as the applicable law and, if not explicitly consented to it, have at least acquiesced in its application. Even were one of the parties to contend that the law of another state should apply, that contention was not raised below and hence need not be considered here. *Kenai Oil & Gas, Inc. v. Dep't of the Interior*, 671 F.2d 383, 388 (10th Cir.1982). Moreover, even assuming that another jurisdiction's law would apply, none of the parties has shown us how the law of other jurisdictions differs from the law of Utah. We shall therefore treat Utah law as controlling where state law applies and where there are Utah statutes or cases on point.

the other hand, he argues, under applicable modern law a person who acquires property of another by fraud has no title to or interest in the property whatsoever.

As support for this proposition, Dietz cites *Corporation of the President of the Church of Jesus Christ of Latter-day Saints v. Jolley*, 24 Utah 2d 187, 467 P.2d 984 (1970). There, the Utah Supreme Court stated, without citation:

> Where one has stolen or embezzled the money or property of another, he obtains no title whatsoever. A constructive trust may be impressed upon it in his hands; and equity may continue the trustee effective against *any* subsequent transferee, unless transferred to a bona fide purchaser and under circumstances where equity would require a different result.

467 P.2d at 985. Dietz argues that the same rule applies to one who obtains money by fraud—that is, that he obtains no title to the money. *See Heyman v. Kemp (In re Teltronics, Ltd.)*, 649 F.2d 1236, 1239 (7th Cir.1981) ("it is settled that property obtained by fraud of the bankrupt is not part of the bankrupt's estate"). *See also, Giannone v. Cohen (Matter of Paragon Sec. Co.)*, 589 F.2d 1240, 1242 (3d Cir. 1978); *Nicklaus v. Bank of Russellville*, 336 F.2d 144, 146 & 147 (8th Cir.1964) (a trustee in bankruptcy "can have no interest in property acquired by the fraud of a bankrupt" since property obtained by the fraud of the bankrupt "is not properly a part of the assets of a bankrupt's estate"). Dietz reasons that if the debtors never had any interest in the money, then it was never the debtors' "property," and the trustee could not recover it pursuant to section 548.

The trustee does not dispute the fact that all of the money he seeks to recover was obtained by the debtors' fraud. He nevertheless contends that the money was "property" of the debtors. Resolution of to whom the funds belonged requires an understanding of the effect of fraud on transactions such as those involved in this case. We are not convinced that *Jolley* and the other cases cited by Dietz represent the change in the common law that he claims they do.

The debtors in these cases solicited investments from the defendants and other "undertakers," who signed "investor contracts" by which they committed to the debtors a specified sum of cash, credit or commodities. The funds were committed for a period of nine months, at which time the principal amount was to be returned. Investors could elect to receive fixed monthly interest payments over the nine months or receive a single, lump-sum interest payment at the end of the nine-month period. The funds committed were to remain under the debtors' custody and control. The money invested in the debtor enterprises went into a common fund, from which payments of interest and principal were made, at least initially, according to the terms of the investor contracts. Because the debtors never conducted any legitimate business and thus had no real earnings, the payments came solely from funds that other investors had committed.

As a general rule, such a fraud vitiates a transaction. *Swanson v. Sims*, 51 Utah 485, 170 P. 774, 778 (1918) (denying petition for rehearing). An agreement induced by fraud, however, is merely voidable, not void. *See, e.g., United States v. 1,557.28 Acres of Land*, 486 F.2d 445, 447 (10th Cir.1973); *Tanner v. District Judges of the Third Judicial District Court*, 649 P.2d 5, 6 (Utah 1982); Restatement (Second) of Contracts § 164 (1979). The person defrauded may affirm the contract and sue for damages, or he may elect to rescind the contract, provided that the rights of third persons have not intervened. *Baker v. Casey*, 166 Or. 433, 112 P.2d 1031, 1033–34 (1941). Until disaffirmed, the contract is valid. *Fryer v. Campbell*, 48 Wyo. 122, 43 P.2d 994, 996–97 (1935).

Here, the persons who were defrauded out of the property the trustee seeks to recover did nothing to avoid the transactions. They did not rescind their contracts but rather accepted or anticipated payments according to their terms. Unless

the defrauded party takes affirmative action to avoid a contract induced by fraud, property transferred under the contract must belong to the defrauder. The defrauded party may have a claim against the defrauder for damages, but that claim makes him only a creditor. *See* 4 *Collier on Bankruptcy* ¶ 547.19 at 547–73 (L. King 15th ed. 1985). It does not vest in him title to the property with which he has parted. Under these circumstances, we hold that the debtors had a sufficient interest in the property to make it "property" of the debtors within the meaning of section 548.

The *Jolley* case cited by the appellant is not to the contrary. *Jolley* involved stolen money—not money obtained by fraud. The difference between stolen property and property obtained by fraud was explained long ago:

> There is a very obvious distinction between the cases of goods obtained by felony and fraud ...; in the one case, the owner of the goods has no intention to part with his property; in the other he has. A contract for the sale of goods, though obtained by fraud, is perfectly good, if the party defrauded thinks fit to ratify it.

*White v. Garden*, 10 C.B. 919 (1851), *quoted in* R. Brown, *The Law of Personal Property* § 70 at 237–38 (2d ed. 1955).

■ The difference is apparent in the principle that one cannot transfer better title to a chattel than he possess. *See* R. Brown, *Supra*, § 67 at 231. One who steals property cannot pass good title to it, even to a bona fide purchaser. *See Western Sur. Co. v. Redding*, 626 P.2d 437, 439 (Utah 1981); *Gurley v. Phoenix Ins. Co.*, 233 Miss. 58, 101 So.2d 101 (1958); *Allstate Ins. Co. v. Estes*, 345 So.2d 265 (Miss.1977). *Cf. Butler v. Farmers Ins. Co.*, 126 Ariz. 371, 616 P.2d 46, 47 (1980) (bona fide purchaser of stolen property has a title defeasible only by the rightful owner). On the other hand, under modern law, a person who obtains property by fraud *can* transfer good title to a bona fide purchaser. *See* U.C.C. § 2–403 (1976); *Paschal v. Hamilton*, 363 So.2d 1360 (Miss.1978). *Contra Hewitt v. Malone*, 105 Ga.App. 281, 124 S.E.2d 501 (1962); *Wyatt v. Singley*, 103 Ga.App. 182, 118 S.E.2d 841 (1961). He must therefore have title to the property, or at least some legally recognized interest in the property. Otherwise, if the person defrauded out of his money elected to affirm the contract and sue for damages, the money could not be used to pay any judgment obtained and the defrauded person could be left without an effective remedy. Thus, although it may be true that one who steals or embezzles money obtains no title to it, one who obtains money by fraud obtains some interest, namely, a defeasible title.

■ We therefore conclude that, where a debtor obtains money by fraud and mingles it with other money so as to preclude any tracing and where the defrauded party does not timely avoid the transaction, the money is "property" of the debtor within the meaning of section 548 of the Code.

## Protection Under 11 U.S.C. § 550(b)(1)

The funds at issue in this case were avoided by the trustee pursuant to 11 U.S.C. §§ 544, 548. 11 U.S.C. § 550 allows the trustee to recover such funds from the initial transferee of an avoided transfer, from the entity for whose benefit the transfer was made or from any immediate or mediate transferee of the initial transferee.[5] The right of the trustee to recover under subsection 550(a)(2) from any transferee other than an initial transferee is

---

5. Section 550(a) of the bankruptcy code provides:

**Liability of transferee of avoided transfer**
(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

limited by sub section 550(b).[6] This section protects any immediate or mediate good faith transferee of an initial transferee provided he takes for value, in good faith and without knowledge of the voidability of the transfer avoided.

Dietz contends that he was entitled to protections of section 550(b)(1). He argues the uncontroverted evidence at trial established that, between 1976 and 1981, he loaned tens of thousands of dollars to a Mr. Stanley Willmitt, ("Willmitt") both personally and through Baltimore Investments, a corporation under the control of Willmitt. Throughout their business association, Willmitt repaid funds that Dietz had previously advanced to him. Dietz asserts that Willmitt paid him the funds at issue here as part of the ongoing business relationship between the two. He stresses that no evidence at trial indicated he had any knowledge of the business operations of the debtors, of any association between the debtors and Willmitt, or of the origin of the funds at question.

Dietz argues that because the testimony at trial established he received no funds directly from the debtors, the bankruptcy court erred in not applying the protections of section 550(b)(1).[7] He reasons that in granting judgment in favor of the trustee, the court relied on an erroneous interpretation of that section.[8]

The trustee disagrees. He argues that the evidence at trial established transfers of funds from the debtors to appellant Dietz either directly or indirectly. He asserts that because the debtors received no consideration in exchange for the funds transferred, such funds were properly recovered by the trustee pursuant to 11 U.S.C. § 544(b) and § 550. He submits that the protections of section 550(b)(1) which apply only to "immediate or mediate transferees" of initial transferee, did not apply to Dietz because Dietz was either an "initial transferee" of funds improperly transferred from the debtors or the "entity for whose benefit such transfers were made."

 The language of section 550 is clear. When an immediate or mediate transferee of an initial transferee ("subsequent transferee") takes for value, in good faith and without knowledge of the voidability of the avoided transfer, he falls within the protections of section 550(b)(1) and the trustee cannot recover from him. This is the case regardless of whether the initial transferee gave any value to the debtor. *DeRochfort Co. v. Sunshine State Bank (In re DeRochfort Co.,)*, 22 B.R. 826, 827 (Bankr.S.D.Fla.1982).

In interpreting section 550(b)(1), the bankruptcy court held that "to have a subsequent transfer protected, the *initial* transferee must take for value in good

6. Section 550(b) of the bankruptcy code provides:
> (b) The trustee may not recover under section (a)(2) of this section from—
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.

7. Dietz concedes that when an entity or individual is a mere conduit for delivery of funds from the debtor to a third party and receives no benefit from the transaction, the third party for whose benefit the funds were intended is treated as if he were the initial transferee and therefore is not eligible for the protections contained in section 550(b)(1). *See* 11 U.S.C. § 550(a)(1). Dietz maintains, however, that there was no evidence at trial that Willmitt was a "mere con-

duit" for the transfer of funds from the debtors to Dietz. In fact, Dietz urges that the uncontroverted evidence established no relationship between him and the debtors and further established that Willmitt received a benefit from the transfers to Dietz in the form of credit for payment of antecedent debts.

8. With regard to section 550(b)(1), the bankruptcy court held as follows:
> "An interpretation of Section 550 of the bankruptcy code is important to the decision in this case, and in looking at section 550(b)(1), the court believes that we must look at it in terms of the initial transferee from the debtor[.] [T]o have a subsequent transfer protected, the *initial* transferee must take for value in good faith and without knowledge of the voidability of the transfer."

faith and without knowledge of the voidability of the transfer." (emphasis added). This interpretation is clearly at odds with the clear meaning of the statutory language as well as with the legislative history and pertinent caselaw.

Subsection 550(b)(1) is expressly limited in application to subsequent transferees by its reference to subsection 550(a)(2) and was intended to provide protection to subsequent transferees who exchange value for their receipt of property. *Matter of Barnett*, 30 B.R. 119 (Bankr.N.D.Ala.1983). Nowhere does subsection 550(b)(1) impose a requirement that the initial transferee give value to the debtor before a subsequent transferee is protected. *In Re Rochfort Co.*, 22 B.R. at 827. Yet, under the interpretation given subsection (b)(1) by the bankruptcy court, no subsequent transferee would be protected from the trustee's avoiding power if the initial transferee did not give value to the debtor. Any consideration which passed between a subsequent and an initial transferee would be immaterial. Such a result is not in keeping with the purpose of the statute.

■ We hold, therefore, that the bankruptcy court erred in its interpretation of section 550(b) by focusing on the issue of the value that passed to the debtor rather than on the value passing from the subsequent transferee to the initial transferee. So long as Dietz was not the initial transferee and so long as he took for value, in good faith and without knowledge of the voidability of the avoided transfer, he falls within the protections of section 550(b)(1) and the trustee cannot recover from him. We will determine whether Dietz met these elements by considering them in reverse order.

We start with the requirement that Dietz must not have had any knowledge of the voidability of the avoided transfers. There is no question but that Dietz satisfied this requirement. While the bankruptcy court did not make a finding of fact with regard to this issue, the evidence at trial was uncontroverted that Dietz was aware of neither the nature of the Clearinghouses nor of any association between the Clearinghouses and Willmitt. There was no evidence presented by the trustee that would indicate Dietz had any knowledge of the voidability of the avoided transfers.

There is similarly no real question as to whether Dietz met the next requirements of section 550(b)(1); that he took for value and in good faith. Once again, the bankruptcy court made no factual finding as to these issues. However, the evidence at trial was uncontroverted that Willmitt owed Dietz substantial sums and that Dietz, in good faith, considered the sums received to be payment on these antecedent debts. Section 550(b)(1) specifically provides that satisfaction of a present or antecedent debt fulfills the requirement of taking "for value." The trustee presented no evidence to the contrary on either of these points.[9]

The final question to be resolved in determining the applicability of section 550(b)(1) is whether Dietz fell under section 550(a)(2) as an immediate or mediate transferee of an initial transferee. If Dietz meets this requirement, he is entitled to the protections of section 550(b)(1).

The trustee asserts that the bankruptcy court did not apply the protections of section 550(b)(1) because it found Dietz to be an initial transferee. He argued that the court's holding did not rely on its interpretation of section 550(b). Dietz argues, however, that the bankruptcy court's holding was based upon its erroneous interpretation of section 550(b). He argues that if the bankruptcy court failed to apply section 550(b)(1) because it found him to be an initial transferee, such a finding was clearly erroneous.

9. The only witness appearing on behalf of the trustee at trial was Dr. Ronald N. Bagley ("Bagley"), the trustee's accountant. Bagley testified with regard to evidence gleaned from the business records of the debtors. He did not testify as to those facts which could not be learned from the books of the debtors, e.g., the relationship between Dietz and Willmitt, or the good faith of Dietz.

Initially we note that the bankruptcy court's findings with regard to the issue of whether Dietz was an immediate or mediate transferee of an initial transferee are not clear. The interpretation given section 550(b)(1) by the bankruptcy court did not require the court to make such a determination. Because it is possible that the bankruptcy court's holding was based on a finding that Dietz was an initial transferee, rather than on its erroneous interpretation of section 550(b), we will assume for purposes of discussion that the bankruptcy court found Dietz to be the initial transferee. We will therefore approach the issue by analyzing whether such a finding with regard to each of the transactions was clearly erroneous.

■ The first transaction involved a $10,000 cashier's check made payable to Dietz purchased by Tonder Payable Company, one of the debtors. The trustee argues that Dietz was the initial transferee. Dietz argues the uncontroverted evidence at trial showed that Willmitt delivered the check to him, thus making Willmitt the initial transferee. The fact that the check was drawn on one of the debtors and made payable to Dietz undercuts Dietz's argument and supports the trustee's position. The identity of Dietz as the payee on a cashier's check purchased by one of the debtors convinces us that there was evidence from which the court could have concluded Dietz was the initial transferee. Thus, the holding of the bankruptcy court on this transaction was not clearly erroneous. We affirm the bankruptcy court with regard to this transaction and hold that the trustee is entitled to a judgment of $10,000 against Dietz.

■ The second transaction involved a check for $10,000 made payable to Theodore Ayervais drawn on Accounting Services, one of the debtors. Written on the check was the notation "for Thomas Dietz." The bankruptcy court specifically found that the sum was paid at Dietz's "request and for his benefit for an obligation owed to Theordore Ayervais for attorney's fees." It held that the trustee could therefore recover the property from Dietz as the entity for whose benefit the transfer was made pursuant to subsection 550(a)(1).

Dietz argues the evidence does not support a finding that the transfer was made for his benefit and asserts that any benefit received in that transaction went to the New Amsterdam Insurance Company which Ayervais had been retained to form. The trustee points out, however, that the check included the notation "for Thomas Dietz," that Dietz requested the transfer of funds and that the sum of $10,000 was used as a retainer for Ayervais who was going to create a reinsurance company at the behest of Dietz. The trustee argues these facts demonstrate that Dietz fell within subsection (a)(1) of 11 U.S.C. § 550 as the entity for whose benefit the transfer was made and that, because Dietz falls within subsection (a)(1), he is not entitled to the protections of subsection (b)(1).

■ We agree with the trustee. A check, drawn on one of the debtors and bearing the notation "for Thomas Dietz," supports a finding that Dietz fell within subsection (a)(1) as the entity for whose benefit the transfer was intended. Such a finding support the court's holding that Dietz was not entitled to the protection of section 550(b)(1). The fact that the insurance company was never formed and that Dietz, ultimately received no benefit from Ayervais' services does not undercut this conclusion. Subsection (a)(1) requires that the transfer have been made for the benefit of the entity from whom the trustee seeks recovery. It does not require that the entity actually *receive* the benefit. We therefore affirm the bankruptcy court's holding that the trustee is entitled to a judgment of $10,000 against Dietz on this transaction.

The third and fourth transactions involved two checks, each for $10,000, made payable to Dietz, that were drawn on the account of La Page Corporation. The bankruptcy court found that the funds of La Page Corporation were funds of the debtors and that the debtors had been given no consideration for the transfers. It

held that the trustee could recover the funds from Dietz. The bankruptcy court made no finding on, and no evidence was presented on, the business activities of La Page Corporation, the relationship of the debtors to La Page or the relationship of Dietz to La Page. The bankruptcy court also made no specific finding as to whether Dietz or La Page was the initial transferee.

Dietz contends that the uncontroverted evidence at trial established La Page Corporation to be the initial transferee and therefore Dietz was an immediate transferee of the initial transferee. As such, he contends he qualifies for the protections of section 550(b)(1). The trustee argues in support of the bankruptcy court's holding by asserting that the evidence at trial established Dietz fell into section 550(a)(1) and was therefore not eligible for the protections of section 550(b)(1).

■ Examination of the trial transcript and the ruling of the bankruptcy court convinces us of the correctness of Dietz's position. There was no evidence at trial that indicated La Page to be anything other than a legitimate corporation. Neither was there any evidence indicating that La Page was a mere conduit for a transfer of funds from the debtor to Dietz.[10] If, as the trustee contends, the bankruptcy court based its ruling on a factual finding that Dietz fell into section 550(a)(1), we must conclude that such a finding was clearly erroneous. The evidence in the record is uncontrovert-

ed that Dietz was an immediate transferee of an initial transferee.[11] As such, he fell into section 550(a)(2) and was eligible for the protections contained in section 550(b)(1). We therefore reverse the bankruptcy court's ruling as to both La Page transactions.

The final transaction involved a check for $25,000 drawn on the account of Baltimore Investments and made payable to Warren & Sommer. The bankruptcy court entered judgment for the trustee, finding that the funds paid to Warren & Sommer were to be applied upon the account and for the benefit of Thomas J. Dietz and that the funds involved came from the funds of the debtors.

Dietz contends that the bankruptcy court erred here, as it did in its consideration of the La Page transactions, because the uncontroverted evidence at trial established that Dietz was entitled to the protections of section 550(b)(1). Dietz contends that the bankruptcy court erroneously focused on the consideration Baltimore Investments gave to the debtor rather than on the value that Dietz gave to Baltimore Investments.

■ The trustee contends that Baltimore Investments was merely an organization used by Willmitt to "wash" transactions involving funds of the debtors. He contends that Baltimore Investments was a mere conduit for the debtors' funds and that they were really transferred for the benefit of Dietz.[12]

10. If La Page were a mere conduit for the transfer of funds from one of the debtors to Dietz, Dietz would presumably fall under section 550(a)(1) as the entity for whose benefit the transfer was made.

11. Dietz testified at trial that he was not a creditor of the debtors and had no financial dealings with them. He also testified that he was not aware of any relationship between Willmitt and the debtors.

12. The brief for the trustee implies that even had the bankruptcy court held Baltimore Investments to be the initial transferee, Dietz would still not be eligible for the protections of subsection (b)(1) because he would fall under subsection (a)(1) as the entity for whose benefit the transfer was intended. We cannot agree. A reading of subsection (a)(1) in conjunction with

the remainder of section 550 leads to the conclusion that the phrase "or the entity for whose benefit such transfer was made" refers to those who receive a benefit as a result of the initial transfer from the debtor—not as the result of a subsequent transfer.

Inequitable results would follow if one who benefits from a subsequent transfer is classified as a subsection (a)(1) transferee while one who actually receives a subsequent transfer is classified as a subsection (a)(2) transferee. Under such a classification an entity which actually *received* property from an initial transferee would be entitled to the protections of section 550(b) while one who did not actually receive the property but benefitted in some way from the transfer would not be entitled to those same protections. We cannot believe that in passing section 550, Congress intended such disparate

An examination of the record convinces us that if the bankruptcy court's ruling on the Baltimore Investments transaction was based on a finding that Baltimore Investments was a sham corporation and that Dietz was therefore the initial transferee, such a finding is clearly erroneous.[13] There is simply no evidence in the record to sustain a finding that Baltimore Investments was a mere conduit for the debtors' funds. The trustee's only witness at trial, Ron Bagley, testified that he did not know the business purpose of Baltimore Investments. While Bagley estimated that 90 to 95 percent of the funds received by Baltimore Investments originated from the debtors, such an estimate is not sufficient upon which to base a finding that Baltimore Investments was a mere conduit for funds from the debtors to Dietz.[14] This is particularly so in light of the uncontroverted evidence that, prior to the transfer in question, Dietz had advanced funds to Baltimore Investments and considered the transfers from Baltimore Investments repayment of those advances.

We find that Dietz did not fall within section 550(a)(1) and was therefore eligible for the protections of section 550(b)(1). There was no evidence presented at trial that Dietz and the debtors were using other entities to "wash" transactions between them. Under such circumstances, we will not impose on a subsequent transferee who takes for value and in good faith the affirmative duty to trace all funds he receives in order to insure they are not voidable transfers from a bankrupt estate. Congress did not intend to impose such a duty and therefore enacted the protections of section 550(b)(1). With regard to the Baltimore Investments transaction, Dietz qualified for such protection.[15]

### Prejudgment Interest

Dietz finally contends that the bankruptcy court abused its discretion in granting prejudgment interest to the trustee. Although he acknowledges that the court has broad discretion in determining when prejudgment interest should be granted to the prevailing party, he argues that the court's failure to consider the merits of his defense and the timeliness of trial constitutes error because such consideration was essential to the proper exercise of

treatment of direct and indirect beneficiaries. Furthermore, the language of subsection (a)(1) requires that the transfer have been *made* for the benefit of an entity before the trustee can recover. This phraseology implies a requirement that, in transferring the avoided funds, the debtor must have been motivated by an intent to benefit the individual or entity from whom the trustee seeks to recover. It is not enough that an entity benefit from the transfer; the transfer must have been made for his benefit. Unless the initial transferee is an agent of the debtor, a transfer would be motivated by a desire to benefit the entity that received or benefitted from the *initial* transfer. The phrase "the entity for whose benefit was made" must have been intended to apply to transfers in which the debtor used an agent. *See Gropper v. Unitrac, (In re Fabric Buys of Jerico, Inc.)* 33 B.R. 334, 336–37 (Bankr.S.D.N.Y.1983). 4 Collier on Bankruptcy ¶ 550.03, 550–9 (15th ed. 1985). We therefore hold that the phrase "the entity for whose benefit the transfer was made" refers to the one who received the benefit as a result of the initial transfer from the debtor—not of a subsequent transfer. Thus, those who benefit vicariously by subsequent transfers of avoided property are still eligible for the protections of subsection 550(b).

13. The bankruptcy court's findings of fact make no mention as to the relationship between Dietz and Baltimore Investments, the business of Baltimore Investments or the relationship between the debtors and Baltimore Investments. Furthermore, a review of the record discloses no reason the debtors would have had for transferring funds to Dietz through Baltimore Investments inasmuch as Dietz was not a creditor of the debtors.

14. If Baltimore Investments received funds from the debtors without paying consideration, Baltimore Investments is the initial transferee and the entity against whom the trustee should recover. ‹

15. Dietz also argues that the funds paid by Baltimore Investments to Warren & Sommers were not for his personal benefit but for the benefit of a corporation in which he is a shareholder. He contends that the bankruptcy court erred in holding him personally liable. We need not address this argument in light of our decision that Dietz is entitled to the protections of section 550(b)(1).

the court's discretion. However, Dietz cites no authority for his argument, and we find it to be without merit.

If we are to find that the bankruptcy court abused its discretion, we "must have a definite conviction that the court, upon weighing relevant factors, clearly erred in its judgment." *Gordon v. United States Steel Corp.*, 724 F.2d 106, 108 (10th Cir. 1983) (citing *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 452 (9th Cir.1980); *Pue v. Sillas*, 632 F.2d 74, 78 (9th Cir.1980)). Thus, appellant can prevail only if we find that the bankruptcy court "clearly erred in its judgment" by failing to give any weight at all to a factor crucial to the exercise of its discretion.

State law governs awards of prejudgment interest in bankruptcy proceedings. *In re Stevens*, Bankruptcy Case No. 82C–01201 at 5–6 (Bankr.D.Utah June 30, 1983) (citing *In re Wilson*, 12 B.R. 363, 370 (Bankr.M.D.Tenn.1981); *In re Spector*, 22 B.R. 226, 234 (Bankr.N.D.N.Y.1982)). Therefore, we must turn to the law of Utah for guidance in determining what factors are relevant to a prejudgment interest award. Under Utah law, the rationale for awarding prejudgment interest to the prevailing party is not to penalize the other party for some lack of merit in its case but is, rather, to make the prevailing party whole. *See Uinta Pipeline Corp. v. White Superior Co.*, 546 P.2d 885, 887 (Utah 1976); *Fell v. Union Pac. Ry. Co.*, 32 Utah 101, 88 P. 1003, 1005–07 (1907); *First Sec. Bank of Utah, N.A. v. J.B.J. Feedyards, Inc.*, 653 P.2d 591, 599–600 (Utah 1982). The only requirement is that the amount of damages be certain at the date from which interest is granted. *See Uinta Pipeline*, 546 P.2d at 887; *Fell*, 88 P. at 1006–07; *First Sec. Bank*, 653 P.2d at 600 (citing *Bjork v. April Industries, Inc.*, 560 P.2d 315 (Utah 1977), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977)). Thus, under Utah law, the relative merit of appellants' case is entirely irrelevant to an award of prejudgment interest. We cannot find that the bankruptcy court, in ignoring an irrelevant factor, abused its discretion.

A finding of abuse of discretion is precluded not only by Utah law, but also by bankruptcy law. "[I]t is well settled that in an action to set aside a preference the trustee is entitled to prejudgment interest from the date of demand for its return, or, in the absence of a prior demand, from the date of commencement of the adversary proceeding." *In re Independent Clearing House Co.*, 41 B.R. 985, 1015 (Bankr.D. Utah 1984) (citing *Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *Palmer v. Radio Corp. of America*, 453 F.2d 1133, 1140 (5thCir.1971); *Salter v. Guar. Trust Co. of Waltham*, 237 F.2d 446, 447–48 (1st Cir.1956); *Roth v. Fabrikant Bros., Inc.*, 175 F.2d 665, 669 (2nd Cir.1949); *Waite v. Second Nat. Bank of Belvidere, Ill.*, 168 F.2d 984, 987–88 (7th Cir.1948); *Manufacturers' Finance Co. v. Marks*, 142 F.2d 521, 528 (6th Cir.), *cert. denied*, 323 U.S. 721, 65 S.Ct. 52, 89 L.Ed. 579 (1944); *Plymouth County Trust Co. v. MacDonald*, 60 F.2d 94, 97 (1st Cir.1932); *Elliotte v. American Sav. Bank & Trust Co.*, 18 F.2d 460, 462 (6th Cir.1927); *In re Roco Corp.*, 37 B.R. 770, 774 (Bankr.D.R.I. 1984); *Matter of Craig Oil Co.*, 31 B.R. 402, 409 & n. 7 (Bankr.M.D.Ga.1983); 3 Collier on Bankruptcy ¶ 60.63[1], at 1129 (14th ed. 1977); Annot., 4 A.L.R.2d 327 (1949)).

The reasoning of these cases and treatises applies not only to voidable preferences, but also to conveyances that are fraudulent under Section 548. In *Robinson v. Watts, Detective Agency, Inc.*, 685 F.2d 729, 741–42 (1st Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983), the First Circuit approved the rule that prejudgment interest should be awarded from the date of commencement of the action, but declined to award interest in a proceeding to recover a fraudulent conveyance under former 11 U.S.C. § 107(d)(2), the predecessor of Section 548(a)(2), only because the property conveyed did not have a definite and ascertainable value.

For the reasons stated above, the bankruptcy court did not abuse its discretion in

awarding prejudgment interest from the date of commencement of the suit. The award of prejudgment interest is therefore affirmed as to the transactions on which we have affirmed the bankruptcy court.

Accordingly, we hold that the trustee is entitled to a judgment in the amount of $20,000.00, together with interest from the date of filing of the complaint.