**In re Wayne R. OGDEN, Debtor.**

**Steven R. Bailey, Trustee of the Estate of Wayne Ogden, Plaintiff–Appellee,**

**v.**

**Blake Hazen, Defendant–Third–Party Plaintiff–Appellant,**

**Bretwood Company, Inc., also known as Development Bretwood Co., A Utah Corp., Defendant–Third–Party Plaintiff,**

**Avis & Archibald, L.C. Third–Party Defendant.**

**BAP No. UT–99–044.**

**Bankruptcy No. 97–25192.**

**Adversary No. 98–2202.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Jan. 14, 2000.

Mona Lyman Burton, McKay, Burton & Thurman, Salt Lake City, Utah, for Defendant–Third–Party Plaintiff–Appellant.

Duane Gillman (Leslie Randolph with him on the brief), McDowell & Gillman, for Plaintiff–Appellee.

Before McFEELEY, Chief Judge, BOHANON, and ROBINSON, Bankruptcy Judges.

## OPINION

McFEELEY, Chief Judge.

Blake Hazen ("Appellant") appeals an order of the United States Bankruptcy Court for the District of Utah that granted summary judgment to the Trustee of the Estate of Wayne Ogden ("Trustee"/Appellee) on the issue of whether a transfer of $100,000 made to the Appellant was a preferential transfer under 11 U.S.C. § 547 and recoverable under 11 U.S.C. § 550.[1] Appellant argues that summary judgment was unsupported for three reasons. First, Appellant contends that the record contains no evidence that would support a finding of a preferential transfer under § 547 as the Trustee failed to establish that there was an antecedent debt or debtor/creditor relationship between the Appellant and the Debtor. Second, Appellant

---

**1.** All statutory references are to title 11 of the United States Code, unless otherwise noted.

alleges that the bankruptcy court erred when it found that under § 547(b) the Debtor had an interest in all of the property that was transferred to the Appellant. Third, Appellant argues that the bankruptcy court incorrectly applied the legal standards of § 550(a)(1) when it found that Avis & Archibald Title Insurance Company ("Avis & Archibald") was a commercial conduit and not an initial transferee.

We find that the record presents some evidence that could establish a debtor/creditor relationship between the Appellant and the Debtor under § 547(b)(1) and (2). However, we find that the record does not support the bankruptcy court's finding under § 547(b) that the Debtor had an interest in all of the property that was transferred to the Appellant. Finally, we find that the bankruptcy court erred legally when it applied § 550(a)(1) to the transaction at issue and found that $100,-000 was recoverable from the Appellant on the grounds that the Appellant was an initial transferee. We hold that when there is a debtor/creditor relationship between a financing institution and a debtor and the financing institution receives money in satisfaction of a debt created by that debtor/creditor relationship, the financing institution cannot be a financial conduit because it is an initial transferee under § 550(a)(1). We reverse.

## I. *Jurisdiction*

The Bankruptcy Appellate Panel has jurisdiction over this appeal. The bankruptcy court's judgment disposed of the adversary proceeding on the merits and is subject to appeal under 28 U.S.C. § 158(a)(1). *See Cunningham v. Hamilton County*, 527 U.S. 198, 119 S.Ct. 1915, 1920, 144 L.Ed.2d 184 (1999). The Appellant's notice of appeal was timely under Fed. R. Bankr.P. 8002, and the parties have consented to this Court's jurisdiction by failing to elect to have the appeal heard by the United States District Court for the District of Utah. 28 U.S.C. § 158(c)(1);

Fed. R. Bankr.P. 8001; 10th Cir. BAP L.R. 8001–1.

## II. *Standard of Review*

■ "For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable *de novo* ), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion')." *Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir. 1996). This Panel reviews an order granting summary judgment *de novo. Taylor v. Meacham*, 82 F.3d 1556, 1559 (10th Cir. 1996). Pursuant to Bankruptcy Rule 7056, which adopts Federal Rule of Civil Procedure 56, summary judgment is permitted when there are no genuine issues of material fact before the court such that the moving party is entitled to judgment as a matter of law. Fed. R. Bankr.P. 7056; Fed.R.Civ.P. 56(i); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poultry, Inc.*, 971 F.2d 492, 494 (10th Cir.1992); *Harris v. Beneficial Okla., Inc. (In re Harris)*, 209 B.R. 990, 994–95 (10th Cir. BAP 1997). When applying this standard, we review the factual record in the light most favorable to the nonmoving party to determine if there are genuine issues of material fact and to discern if the bankruptcy court correctly applied the relevant substantive law. *Jenkins v. Wood*, 81 F.3d 988 (10th Cir.1996).

## III. *Background*

Wayne Ogden ("Debtor") entered into a real estate purchase contract with the Albert LeRoy Bowhuis family ("Bowhuis") for the purchase of real property ("Property") for the sum of $874,000.00. Subsequently, the Debtor approached the Appellant and Douglas Durbano ("Durbano") about financing the Debtor's purchase of the Property in the amount of $400,000.00.

The Debtor told them that the loan would be secured by a first lien on the Property and that there would be a return of $600,000.00 on their $400,000.00 loan in approximately two weeks. Appellant and Durbano decided that they would lend money to Durbano's financing company, Big Sky,[2] which would then lend the money to Debtor to purchase the Property. Appellant then arranged for his own company, Bretwood Company, Inc., to lend the money to Big Sky.[3] Appellant contributed $100,000.00 and Durbano, through Big Sky, contributed $296,000.00. Additionally, Big Sky charged Debtor a loan fee of one percent, or $4,000.

Avis & Archibald was the escrow agent through which the real estate transaction was to close. In February 1997, Durbano prepared a trust deed promissory note,[4] trust deed, escrow instructions, and a check from Big Sky in the amount of $396,000.00 *payable to Avis & Archibald.* Durbano delivered these documents and the check to Jayson Cherry ("Cherry"), the escrow officer at Avis & Archibald who was to handle the transaction. Cherry opened file no. 10327 ("Property File"), which is the internal file number Avis & Archibald assigned to the transaction. Cherry deposited the money into Avis & Archibald's trust account.

The escrow instructions, dated February 26, 1997, directed Avis & Archibald to hold the $396,000.00 in escrow and to disburse the funds to the Bowhuis family on com-

pletion of certain conditions. The conditions included the following: verbal authorization from Durbano, Debtor's signature on the trust deed promissory note and the deed of trust, and the recording of the deed of trust in a first lien position on the Property. The trust deed promissory note would become effective only upon a closing of the Bowhuis transaction, and if the transaction did not close, then Avis & Archibald would return the $396,000 to Big Sky.

Shortly after Durbano deposited the note, trust deed, monies, and escrow instructions with Avis & Archibald, Durbano asked that the funds be returned.[5] Avis & Archibald complied with a check from its trust account. A few days later, Durbano delivered to Avis & Archibald a check dated March 10, 1997, made payable to the Avis & Archibald trust account in the sum of $396,000.00 together with a letter that stated that the prior escrow instructions of February 26, 1997, should still be followed. The Property File was credited with the new deposit; however, the money was not deposited into the Avis & Archibald trust account until April 8, 1997.

On April 8, 1997, Debtor met with Cherry and told him that Durbano had orally changed the escrow instructions, and now approved the disbursal of the Big Sky funds to Debtor. Cherry testified that he attempted to call Durbano to verify this change but was told that Durbano was out of town. Durbano testified that he was in

2. Durbano is the majority shareholder, only officer, and only director of Big Sky, a company whose business is financing transactions and loaning money. Durbano is also an attorney.

3. Appellant is a developer, landlord, and contractor.

4. Before loaning the Debtor the money, Appellant and Durbano required Debtor to sign a trust deed promissory note in the amount of $600,000.00 in favor of Big Sky. Big Sky executed an assignment of the trust deed promissory note to Appellant/Bretwood Company as part of the loan that Appellant/Bretwood Company made to Big Sky.

5. There is conflicting testimony as to why Durbano requested the return of the funds deposited with the February 26th escrow instructions. Durbano testified that he asked for the funds to be returned because he learned that the Bowhuis were not in a position to close the sale. Cherry testified that the funds were returned because Ogden had not signed the trust deed or trust deed promissory note. It is undisputed that at some point shortly before or after Durbano sent the March 10th deposit to Avis & Archibald, Ogden went to Avis & Archibald's offices and signed the trust deed and the trust deed promissory note.

town on that date and never received a phone call from Cherry. Without attempting to contact anyone else, and in violation of the written escrow instructions, Cherry first deposited the Big Sky check into Avis & Archibald's trust account, and then issued a check to Debtor in the amount of $396,000.00 drawn on the Avis & Archibald trust account.

Two weeks later, Cherry learned that Debtor had lied to him about having Durbano's permission to receive the funds. Cherry gave Debtor one week to return the funds to Avis & Archibald. At this time, Cherry did not tell his employers, Durbano, or Appellant that he had disbursed the funds to Debtor.[6]

Debtor obtained monies from various people to repay Avis & Archibald.[7] These monies were submitted in check form to Avis & Archibald. Each check was made payable to either Debtor or Avis & Archibald. All of the checks were deposited into the Avis & Archibald trust account.[8]

At the same time, a man named Don Jones was using Avis & Archibald to refinance real property with a loan he had obtained from Vanderford Funding ("Vanderford") in the amount of $135,000.00. The purpose of the refinance was to provide funds for his son, Teak Jones, to make a loan to Debtor for a separate transaction unrelated to the one involving Big Sky and Appellant. This transaction had been assigned file no. 10765 ("Jones File"). The funds ("Jones' funds") were wired from Vanderford to Avis & Archibald on May 8, 1997. Debtor knew that this transaction was occurring on that day and called Cherry to tell him that funds were being wired to the Avis & Archibald trust account. Cherry believed these funds were for the Property File. Subsequently, Avis & Archibald credited both the Property File and the Jones File with $135,000.00. Later that same day, Avis & Archibald disbursed the $135,000 credited to the Jones File to Don Jones who subsequently lent the money to Debtor. Debtor deposited those funds into an account at another bank.

With the $135,000.00 mistakenly credited to the Property File, Cherry believed that the $396,000.00 had been fully repaid.

Later, when Durbano learned that the Bowhuis transaction had failed, he instructed Cherry to return the $396,000.00. Durbano asked that Avis & Archibald issue two checks, one to Big Sky in the amount of $300,000.00 and a second check to Appellant in the amount of $100,000.00. At that time, neither Appellant nor Durbano knew that Avis & Archibald had disbursed any funds to Debtor in relation to this transaction. After those checks were disbursed, the Avis & Archibald trust account held no funds segregated to the Property File.

When Avis & Archibald discovered that it had mistakenly disbursed the $135,000

6. Later events revealed that the Debtor was involved in a Ponzi scheme. A "Ponzi" scheme is a fraudulent arrangement that uses later-acquired funds to pay off previous investors. *See Merrill v. Abbott (In re Independent Clearing House)*, 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984) (detailing history of Ponzi schemes). In this case the Debtor received loans from various individuals and businesses for the purchase of real property. Debtor told these investors that he intended to sell these properties to a prearranged buyer at a significant profit. However, most of these transactions never took place and Debtor would use monies from new investors to pay off old ones. One of the ways he transferred monies was through title companies. From September 1, 1995, through June 16, 1997, Debtor obtained over a thousand loans totaling over $23,000,000 from private individuals and business.

7. Debtor obtained $150,000 from DHI Construction, $25,000 from Cathy Sexton, $89,000 from Andrew Weisberg, and $50,000 from Robert Carter. Debtor brought in all of the checks himself, except for the last sum which was brought in by Robert Carter.

8. Not all of the "returned" funds were left in the Avis & Archibald trust account: the Debtor personally took $9,500; and the Debtor had Avis & Archibald disburse $40,000 to Dennis Nelson.

twice-once to Teak Jones, and once to Appellant/Durbano–Avis & Archibald made a claim on its errors and omission insurance for $135,000 and was reimbursed by its insurance carrier.

On June 16, 1997, Debtor's creditors filed an involuntary petition for bankruptcy against him. The Trustee was appointed permanent chapter 7 trustee of Debtor's estate at the § 341 meeting. Approximately one year later, on June 2, 1998, the Trustee filed a complaint against Appellant ("Complaint"), asking to avoid the transfer of $100,000.00 to Appellant as a preferential transfer under § 547(b), and to recover the property under § 550.

In March 1999, both the Appellant and the Trustee filed Motions for Summary Judgment on the Complaint. The Motions were heard on May 18, 1999. Ruling from the bench, the bankruptcy judge granted the Trustee's Motion. This appeal timely followed.[9]

## IV. *Discussion*

At issue is whether the Trustee can recover from Appellant the $100,000.00 Avis & Archibald returned to Appellant from its escrow account. To prevail on a summary judgment motion to recover a preferential transfer, the Trustee must first show that the transfer was preferential under § 547(b); second, the Trustee must offer evidence proving that the preferential transfer is recoverable under § 550.

Under § 547(b), a trustee may avoid "any transfer of an interest of the debtor in property" if the transfer meets all of the following five criteria: 1) the transfer was made to a creditor; 2) because of an antecedent debt; 3) while the debtor was insolvent; 4) within ninety days before the debtor filed a petition; and 5) the transfer enabled a creditor to receive more than the creditor would if the case were a case under Chapter 7, the transfer had not been made, and the creditor had received payment of the debt as provided under the Code.[10] 11 U.S.C. § 547(b). The burden is on the trustee to prove by a preponderance of the evidence the avoidability of a transfer. 11 U.S.C. § 547(g)

The bankruptcy court found that the transaction met all of the criteria of § 547(b) and was a preferential transfer.[11]

9. Subsequently, the Trustee filed an amended complaint that named Bretwood Company, Inc. as an additional defendant. The amended complaint included an additional cause of action under § 548. However, the summary judgment was granted only against Appellant; it did not include Bretwood Company, Inc., and it did not include the § 548 claim.

The Trustee also filed a Complaint under §§ 547(b) and 550 against Durbano/Big Sky. The bankruptcy court also entered summary judgment on the § 547 and § 550 claims against Durbano/Big Sky in favor of the Trustee. Durbano/Big Sky has also filed a notice of appeal of the bankruptcy court's order. However it has elected under 28 U.S.C. § 158(c)(1)(A) to proceed in its appeal before the district court for the district of Utah.

10. Section 547(b) provides in pertinent part:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
  (1) to or for the benefit of a creditor;
  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
  (3) made while the debtor was insolvent;
  (4) made—
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
  (5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b).

11. In his two-paragraph ruling, the bankruptcy judge stated the following:

"Mr. Hazen had every bit of control as to where the money came from and where it

Appellant argues that the evidence did not support the bankruptcy court's finding that there was a preferential transfer because the transfer did not meet all of the criteria of section § 547(b). Specifically, the Appellant alleges that pursuant to § 547(b)(1) the Appellant was not a creditor of the Debtor, and pursuant to § 547(b)(2) there was no antecedent debt. Alternatively, Appellant argues that under § 547(b) the Debtor did not have an interest in the property that was transferred.

To support his argument that §§ 547(b)(1) and (2) were not satisfied,[12] Appellant contends that no debt was ever created between the Appellant and the Debtor since the closing of the Bowhuis sale was a condition precedent to the enforceability of the promissory note signed by Debtor. As the sale never closed, the note was never effective. If the note was never effective, there was no debt between Appellant and Debtor.

The Trustee counters that once the Debtor acquired Appellant's money, Appellant then had a "claim" as defined by the Bankruptcy Code. According to the Trustee, the claim is the debt; once the claim came into existence, then Appellant became a creditor.[13]

The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12).

"Claim" is defined in the Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). The Supreme Court has indicated that in bankruptcy, Congress intended to adopt the broadest available definition of the term claim. *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *see also In re Summit Fin. Servs., Inc.,* 240 B.R. 105, 112 (Bankr. N.D.Ga.1999). On this basis, in bankruptcy, the definition of the term "debt" is the same as the definition of the term "claim." *Pennsylvania Dep't of Pub. Welfare,* 495 U.S. at 557–58, 110 S.Ct. 2126; *Summit Fin. Servs.,* 240 B.R. at 112. One who has a claim against a Debtor "that arose at the time of or before the order for relief concerning the debtor" is a creditor. 11 U.S.C. § 101(9).

The term "antecedent debt" is not defined by the Code. However, courts have assumed a debt to be antecedent if the debt is incurred prior to the transfer. *Clark v. Frank B. Hall & Co. (In re Sharoff Food Serv., Inc.),* 179 B.R. 669, 676 (Bankr.D.Colo.1995).

---

went, ultimately to Mr. Ogden. I don't think it matters where Ogden gets the money to repay this at all. You don't have to trace the same funds. The fact that it was paid, the record is clear, that it was the intent of Mr. Hazen that Ogden get the money and he, Mr. Hazen got it back within the 90 days prior to filing by the time when Mr. Ogden was insolvent.

"Mr. Hazen was a creditor. He was the initial transferee. There was an antecedent debt. I'm guided a lot by the Hashimoto affidavit which hasn't been countered. That affidavit traces the transactions and there has been no—no evidence otherwise. I think I am bound to accept that affidavit, the facts set forth in that affidavit if it isn't countered and it isn't."

**12.** Appellant also argues that Appellant was not a direct party to the real estate transaction since it was Appellant's company, Bret-

wood, that invested in Big Sky; therefore, it is Big Sky that is the creditor. While the record supports a finding that Big Sky was a creditor of both the Debtor and the Appellant prior to the transfer, it does not follow that there was no debtor/creditor relationship between the Appellant and the Debtor. As we explain, the crucial question is whether there was a legal claim or debt between the Appellant and the Debtor prior to the transfer; the existence of simultaneous claims is immaterial to that determination.

**13.** Alternatively, the Trustee argues that the assignment of a one-quarter interest in the promissory note created Appellant's claim against Ogden. However, the Trustee does not answer the Appellant's argument that the promissory note did not create a debt, since the closing of the Bowhuis sale was a condition precedent to the enforceability of the promissory note.

Accordingly, to determine whether the bankruptcy court correctly found that there was a debtor/creditor relationship and an antecedent debt between the Appellant and the Debtor, we must determine if the record established that the Appellant had a claim against the Debtor before the transfer. *See generally In re Presidential Airways, Inc.*, 228 B.R. 594, 598 (Bankr.E.D.Va.1999) (finding that courts determine whether a debt is an antecedent debt by looking to whether "the creditor would be able to assert a claim against the estate if the payment had not been made" (citation omitted)). "The validity of a creditor's claim is determined by rules of state law." *Grogan v. Garner*, 498 U.S. 279, 283, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citation omitted). These events took place in Utah; therefore, Utah law is the relevant state law.

It is undisputed that the Debtor, without authorization, took and used the Appellant's money. A person who uses the personal property of another without consent in such a way that it is a "serious violation of the right of another to control its use is subject to liability to the other for conversion." Restatement (Second) of Torts § 227 (1963–1964). In Utah, an action for conversion lies when there is an " 'act of wilful interference with a chattel, done without lawful justification by which person entitled thereto is deprived of its use and possession.' " *Utah v. Twitchell*, 832 P.2d 866, 870 (Utah Ct.App.1992) (quoting *Allred v. Hinkley*, 8 Utah 2d 73, 328 P.2d 726, 728 (1958)). In *Twitchell*, the defendant took premium payments for insurance coverage from clients and kept the payments without providing the coverage. The *Twitchell* court held that, " [w]hile ordinarily money represented by a general debt cannot be the subject of conversion, an exception is recognized for misappropriated funds placed in the custo-

dy of another for a definite application.' " *Twitchell*, 832 P.2d at 870 (alteration in original) (quoting *Boyd v. Wimes*, 664 S.W.2d 596, 599 (Mo.Ct.App.1984)). Money is converted when the party charged with conversion wrongfully receives the money. *Id.*

Here, before the Debtor returned money to Avis & Archibald, the Appellant may have had a good faith claim for conversion under Utah state law. The record indicates that Appellant placed a specific sum of money in a trust account and instructed that the money was not to leave the account until certain conditions were met. Through misrepresentation, the Debtor obtained the money in the trust account and used it. While the bankruptcy court made no express findings with respect to this issue, for the purposes of this opinion and since the substance of our opinion is based on other grounds, we note that there is some evidence of a good faith conversion claim.

Second, Appellant argues that even if the Trustee can establish an antecedent debt and a debtor/creditor relationship, the Trustee did not prove that the Debtor had an interest in the funds disbursed to the Appellant. Under § 547(b) a preferential transfer occurs only when the debtor has an interest in the property transferred. 11 U.S.C. § 547(b). The Bankruptcy Code does not define the phrase "interest of the debtor in property," nor does the Code ever specifically define "property." Courts have defined the term broadly. *Danning v. Bozek (In re Bullion Reserve of North Am.)*, 836 F.2d 1214, 1217 (9th Cir.1988). We note that the purpose of § 547 is to treat creditors similarly during the preference period.[14] *Id.* Toward that end, through § 547 the trustee can recover property that

---

14. Congress has observed that § 547(b) was enacted to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy ... [and to] facilitate the prime bankruptcy policy of equality of distribution among creditors." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6138.

would have been part of the estate but for the preferential transfer. *Payne v. Clarendon Nat'l Ins. (In re Sunset Sales, Inc.),* 220 B.R. 1005, 1013 (10th Cir. BAP 1998) (quoting *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)). Therefore, we look to the Code's definition of "property of the estate" to help us determine the meaning of the phrase "interest of the debtor in property." *Id.*

■ Property of the estate is defined in § 541(a)(1) as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). With this definition in mind, and in light of the purpose behind § 547(b), the fundamental inquiry under § 547(b) will be whether the Debtor had a legal or equitable interest in the property such that the transfer at issue diminished or depleted the Debtor's estate. *Payne,* 220 B.R. at 1013 (citing *Gill v. Winn (In re Perma Pac. Properties),* 983 F.2d 964, 968 (10th Cir.1992)).

■ Property interests are created and defined through state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The question of whether the Debtor had a legal or equitable interest in the property transferred to the Appellant is one that is resolved by Utah state law.

The Appellant contends that the Debtor did not have an interest in the $135,000.00 that Avis & Archibald mistakenly credited to the Property File[15] because the money was not the Jones' funds but was the product of a mistake made by Avis & Archibald. The Appellant further argues that because it is the Trustee's burden to make a showing that all of the monies paid to the Appellant were monies in which the Debtor had an interest, and since the amount paid to the Appellant was less than the $135,000 in which the Debtor did not have an interest, the Trustee, as a matter

of law, failed to prove that the transfer was a preferential transfer.

The Trustee counters that a debtor has an interest in borrowed funds as well as an interest in funds he acquires through fraud and commingles with other funds. He argues that it is most likely that the Appellant received the Jones' funds since they were first credited to the Property File. Even if the Appellant did not receive the Jones' funds, the Trustee contends, the Debtor had an interest in the $135,000 since he committed fraud when he induced Avis & Archibald to put those funds in the Property File.

■ Neither party to this appeal argues that the Debtor had possessory rights to the $135,000–it is undisputed that the Debtor never had actual control over the funds. The question here is whether the Debtor had any legal interest in the funds as a result of any misrepresentation he made to Avis & Archibald that resulted in funds credited to the Property File. Under Utah state law, one who obtains property by fraud has a legally recognized interest in that property, namely defeasible title. *See Merrill v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118, 124 (D.Utah 1986) (reasoning that one who obtains money by fraud has a defeasible title to that property because a person who obtains money through fraud can transfer good title to a bona fide purchaser); *accord Jobin v. Youth Benefits Unlimited (In re M & L Business Machine Co., Inc.),* 164 B.R. 148, 150 (D.Colo.1994). To maintain a cause of action for fraud in Utah, the plaintiff must prove by clear and convincing evidence each of the following nine elements:

" '(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be

15. The Appellant bases this argument on the fact that the $135,000 was mistakenly credited by Avis & Archibald to two files. Avis & Archibald disbursed $135,000 to Teak Jones, on the day the money was wired to them. Approximately two weeks later, it disbursed the sum again to Appellant and Durbano.

false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.' "

*Mikkelson v. Quail Valley Realty,* 641 P.2d 124, 126 (Utah 1982) (quoting *Pace v. Parrish,* 122 Utah 141, 247 P.2d 273, 274 (1952)). Pursuant to Utah law, if the Debtor committed fraud and thereby obtained a defeasible title to the $135,000 prior to the transfer of the money to the Appellant, then the Debtor had a legally defined interest in the property so as to meet the requirements of § 547(b).

■ Viewing the evidence in favor of the Appellant, we find that the evidence does not support the bankruptcy court's conclusion that the Debtor had an interest in the $135,000 in the Property File. First, we observe that the record contains no evidence that would suggest that the monies credited to the Property File were funds that had been fraudulently acquired from Jones. Rather, the record plainly shows that Jones received $135,000 that had been wired to Avis & Archibald for Jones. Secondly, we observe that the record is clear that this sum came ultimately from the errors and omission insurance of Avis & Archibald.

More importantly, the record does not indicate that the Debtor ever obtained defeasible title to the money through fraud. While the record clearly shows that the Debtor made a representation that money was coming in by wire that was for the Property File, no evidence supports the conclusion that Avis & Archibald reasonably relied on the representation.[16] In fact, the record supports the opposite con-

clusion, because the wire transfer clearly states for whom the money is intended. *See* Applts. App. p. 417. Since, under Utah law, all nine elements must be met to maintain an action for fraud, and the element of reasonable reliance is not supported by the record, we find that the Debtor did not have an interest in all of the funds credited to the Property File.

Alternatively, the Trustee alleges that the funds are recoverable on the ground that a debtor has an interest in borrowed funds. The basis for this argument appears to be that the Debtor constructively "borrowed" the funds from Avis & Archibald. The bankruptcy court made no findings with regard to this claim. Because, as discussed below, we decide that the transfer is not recoverable under § 550, we will not address this argument here.

■ For the benefit of the estate, the trustee may recover an avoided transfer under § 550 by taking the property, or the value of the property transferred from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550. Neither the term "initial transferee" nor the term "immediate or mediate good faith transferee" is defined in the statute or in the Code. The distinction between the two types of transferees is important because an initial transferee will be strictly liable for disgorging the transfer, whereas pursuant to § 550(b), an immediate or mediate transferee has a good faith defense. Section 550(b) provides that the trustee may not recover from any "(1) transferee that takes for value, . . . in good faith, and without knowledge of the voidability of the transferee avoided; or (2) any immediate or mediate good faith transferee of such transferee." 11 U.S.C. § 550(b).

---

**16.** *See Mikkelson,* 641 P.2d at 126 (finding that "[w]hile plaintiff may have initially received false information, he cannot reasonably continue to rely on it once true and corrected information is furnished him, par-

ticularly when that corrected information is contained in a document of the importance and dignity of an appraisal and related forms.").

In *Malloy v. Citizens Bank (In re First Security Mortgage Co.)*, 33 F.3d 42, 43–44 (10th Cir.1994), the Tenth Circuit defined the term "initial transferee." Adopting the "dominion or control test" first delineated in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir.1988), the Tenth Circuit found that " 'the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.' " *Malloy*, 33 F.3d at 44 (quoting *Bonded*, 838 F.2d at 893).

In *Rupp v. Markgraf*, 95 F.3d 936, 939–40 (10th Cir.1996), the Tenth Circuit further explained the "dominion and control" test. In *Rupp*, the Tenth Circuit ruled that the principal of a corporation who had directed a bank to issue a cashier's check purchased with the corporation's funds to pay the principal's debt was not an initial transferee within the meaning of § 550. *Id.* at 939–40. The *Rupp* court found that the principal was not an initial transferee but "at most, a mere courier" of the funds at issue in the transfer because, while the principal had physical control over the funds, the principal never had legal control over the funds. 95 F.3d at 941. Citing again to *Bonded*, the Tenth Circuit explained that to have "control" over funds means having "the right to put funds to one's own purpose, not merely the ability to prevent someone else from doing so." *Id.* at 941. The Tenth Circuit explained that, as first delineated in *Bonded*, there are two types of transactions: a one-step transaction, and a two-step transaction. *Id.* at 939–40. In a one-step transaction, the debtor's check is paid directly to its principal's creditor and the creditor is an initial transferee. *Id.* In a two-step transaction, the debtor's check is paid to the principal, who then pays his own creditor. In the two-step transaction, the principal is the initial transferee. *Id.* Basically, the term "dominion and control" refers to dominion and control over the funds after the disputed transfer, not dominion and con-

trol over the transferor before the transfer. *Id.* at 940.

Here, the bankruptcy court found that Avis & Archibald was not an initial transferee but a financial conduit because Avis & Archibald never had control over the funds at issue. Thus, as Avis & Archibald was not an initial transferee, the bankruptcy court concluded that Appellant was the initial transferee from whom the transfer could be recovered under § 550(a)(1).

Appellant argues that the bankruptcy court erred when it found that Avis & Archibald was a financial conduit because there was a debtor/creditor relationship between Avis & Archibald and the Debtor. He contends that when Avis & Archibald received the funds from Debtor and then disbursed them to Appellant, that the transaction was a two-step transaction, as defined above. That is, when Avis & Archibald acted outside the scope of its authority as an escrow agent and disbursed the funds to Debtor, a debtor/creditor relationship was created between Avis & Archibald and the Debtor. Therefore, when Debtor brought back the funds to Avis & Archibald, Debtor was repaying Avis & Archibald, not Appellant. Since Appellant did not know that the funds had ever left the escrow account or given permission for the funds to leave, Appellant argues that he falls within the definition of a "good faith" mediate or intermediate transferee, and therefore the transfer cannot be recovered under § 550(b)(2).

■■■ We agree with the Appellant, and hold that the bankruptcy court mistakenly applied the law when it found that Avis & Archibald was a financial conduit rather than an initial transferee. As explained by *Rupp*, under § 550(a)(1) an initial recipient of funds is an initial transferee if there is a debtor/creditor relationship between the initial recipient and the transferor that the transfer of the funds satisfies. The record indicates that both prongs of this test are met.

First, there is substantial evidence in the record to show the existence of a debtor/creditor relationship under § 547(b)(1) between Avis & Archibald and the Debtor. At the moment Avis & Archibald transferred the funds to the Debtor, Avis & Archibald accrued the right to demand repayment of those funds from the Debtor. Concomitantly the Debtor incurred an obligation to repay those funds to Avis & Archibald.[17] Pursuant to the Code, a legal obligation to repay funds creates a debt, and consequently a debtor/creditor relationship forms.[18] Concurrently, when Avis & Archibald breached its fiduciary duty to the Appellant and transferred the Appellant's funds to the Debtor, a "debt" as defined by the Code arose between Avis & Archibald and the Appellant.

Second, the record supports the conclusion that when the Debtor delivered the funds to Avis & Archibald, the Debtor satisfied a debt to Avis & Archibald. Subsequently, when Avis & Archibald segregated the delivered funds to the Property File, Avis & Archibald satisfied its debt to the Appellant. This is a two-step transaction as defined by *Rupp.*

The Trustee counters that under *Rupp* Avis & Archibald cannot be an initial transferee because when the funds were brought back Avis & Archibald did not have control over the funds. The Trustee argues that the Debtor instructed Avis & Archibald to put the funds in the Property File; therefore, when Avis & Archibald received the funds and put them in the Property File, they were a commercial conduit because they were acting as an agent pursuant to instructions from the Debtor.

We do not find that the evidence supports this argument. There was a direct business relationship between Avis & Ar-chibald and the Debtor that undermines the Trustee's agency argument. Nothing in the record indicates that when Avis & Archibald received the funds the funds were meant only to satisfy the debt between the Appellant and the Debtor. In fact, the record contains uncontradicted testimony that when the Debtor returned the funds, he did so because Avis & Archibald demanded that he return the funds. The evidence also shows that when the funds were returned, they were made out either to Avis & Archibald or to the Debtor. Unlike the situation surrounding the Jones' funds, the record holds no evidence indicating that the Debtor ever specifically indicated that the funds he brought in were for the Property File. Clearly, Avis & Archibald had legal control over the funds when they put them into their trust account and subsequently segregated the funds into the Property File. More importantly, the return of the funds satisfied the debt between Avis & Archibald and the Debtor.

■ The policy behind § 550 also supports our holding. As a policy matter, initial transferees are strictly liable because they are in the best position to know from whom they got the funds and guard against fraud. *Rupp*, 95 F.3d at 944 (citing *Bonded*, 838 F.2d at 892–93). In other words, an initial transferee should bear the risk of loss because an initial transferee is in the best position to protect against loss. *Id.* Here, when Appellant received the check from Avis & Archibald, he believed he was recovering his own funds. Once the funds had gone into Avis & Archibald trust account, Appellant received no statements and could not draw on the account without Avis & Archibald's knowledge and acquiescence. Basically, the Appellant

---

17. *See, e.g.,* Restatement (Second) of Torts § 228 (1963–64) (stating "one who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated.").

18. As discussed previously, the Code defines "debt" as a liability on a claim; and "claim" is defined as "a right to payment."

was in no position to monitor the funds other than through the written instructions that had been delivered to Avis & Archibald. Moreover, Avis & Archibald never informed Appellant that the funds had been disbursed to Debtor; instead, it directed the Debtor to reimburse it and threatened him with exposure if he did not. The record clearly indicates that the party who was in the best position to monitor fraudulent transfers was Avis & Archibald.

For the above reasons, we conclude that Avis & Archibald was the initial transferee, and the Appellant was a subsequent immediate or mediate transferee.

After granting the Trustee's Motion for Summary Judgment, the bankruptcy court never reached the issue of whether the Appellant was a subsequent good faith transferee under § 550(b). Therefore, the matter must be remanded for consideration of this issue.

## V.  *Conclusion*

The bankruptcy court erred when it found that there was a preferential transfer under § 547(b) because there is no evidence that the Debtor had an interest in all the funds that were transferred to the Appellant. We remand for findings with respect to what degree the Debtor had an interest in the monies transferred to Appellant under § 547(b). Additionally, the bankruptcy court erred as a matter of law under § 550 when it found that the transfer was recoverable from the Appellant on the grounds that Avis & Archibald was a financial conduit and not an initial transferee. However, the bankruptcy court never reached the issue of Appellant's alleged status as a subsequent good faith transferee under § 550(b). The court's determination that the Debtor had an interest in all of the funds transferred to the Appellant, and its finding that the Appellant was an initial transferee under § 550(a)(1), are REVERSED, and the matter is REMANDED for consideration

of these issues under § 547(b) and § 550(b).