**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 30 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

In re: WAYNE R. OGDEN,

　　　Debtor.

---

STEVEN R. BAILEY, Trustee of the
Estate of Wayne R. Ogden,

　　　Plaintiff - Appellee,

　　v.

BIG SKY MOTORS, LTD., a Utah
Corporation, doing business as Big
Sky Finance,

　　　Defendant - Appellant.

No. 00-4055

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## (D.C. NO.  2:99cv270-B)

---

Noel S. Hyde, South Ogden, Utah, for Appellant.

Leslie J. Randolph, of McDowell & Gillman, P.C., Salt Lake City, Utah (Duane
H. Gillman with her on the brief), for Appellee.

---

Before **TACHA,** Chief Judge, and **HENRY** and **BRISCOE** , Circuit Judges.

**HENRY** , Circuit Judge

Big Sky Motors, Ltd., appeals a decision of the district court affirming a decision of the bankruptcy court. See Big Sky Motors, Ltd. v. Bailey , no. 299CV270B, 2000 WL 33672946 (Bankr. D. Utah Feb 4, 2000). Big Sky advances two principal arguments: (1) that the trustee did not establish the elements necessary to avoid a transfer of the debtor's assets under 11 U.S.C. § 547; and (2) that, under 11 U.S.C. § 550, an escrow agency was the initial transferee of the disputed funds rather than a mere financial conduit of those funds. As a result of the escrow agency's alleged transferee status, Big Sky maintains that it should be allowed assert a good faith defense to the trustee's action.

We exercise jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291. We hold that the transaction in question was a preferential transfer under § 547 and that the escrow agency was a financial conduit rather than a transferee under § 550. Therefore, we affirm the district court's ruling.

## I. BACKGROUND

Wayne R. Ogden was a real estate developer in Utah in the 1990s. By the beginning of 1997, Mr. Ogden had become the center of what has been described by one court as a Ponzi scheme, a "fraudulent arrangement that uses later-acquired funds to pay off previous investors." Bailey v. Hazen (*In re* Ogden), 243 B.R. 104, 109 n.6 (B.A.P. 10th Cir. 2000). In the events relevant to the present appeal, Mr. Ogden promised two investors—Douglas Durbano and Blake Hazen—that in only two weeks they would receive a $200,000 return on an initial $400,000 loan. Purportedly, the loan would be used to purchase real property. After surveying the property, Messrs. Durbano and Hazen found the proposed transaction worthwhile. Through companies they each owned (Big Sky and Bretwood Company, Inc.), Mr. Durbano and Mr. Hazen contributed $296,000 and $100,000, respectively.

On March 2, 1997, Big Sky gave the combined $396,000[1] in a check made payable to Avis & Archibald Title Insurance Agency, L.C., an escrow company based in Ogden, Utah. Jayson Cherry, an escrow officer with Avis & Archibald, handled the transaction. Accompanying documents included (1) a trust deed

---

[1] This amount represented the $400,000 loan minus $4,000 (1%) as a loan fee that Big Sky charged Mr. Ogden.

promissory note in the amount of $600,000 in favor of Big Sky, signed by Mr. Ogden on February 26, 1997; (2) a trust deed; and (3) escrow instructions.

The escrow instructions, dated February 26, 1997, directed Avis & Archibald to disburse the funds upon the completion of the following conditions: (1) the execution of the trust deed promissory note and deed of trust; (2) the recording of the deed of trust in a first lien position against the property; and (3) verbal authorization from Mr. Durbano. As to the third condition, the instructions provided:

> [B]efore disbursing the funds, [Avis & Archibald] will need verbal authorization from myself that I have received satisfactory assurances that there is a prospective closing to take place on this property within the next two weeks. Until [Avis & Archibald has] received such authorization from me [Avis & Archibald] should not disburse any funds.

Aplt's App. at 177 (letter from Douglas Durbano to Jason Cherry, Escrow Officer, dated Feb. 26, 1997).

A few days after making the deposit, Big Sky, apparently through Mr. Durbano, requested a return of the funds. Although there is conflicting testimony about the reason for Mr. Durbano's request, Mr. Cherry issued a check for $396,000 from Avis & Archibald to Big Sky. Presumably after receiving further assurances, such as Mr. Ogden's execution of the accompanying trust documents, Mr. Durbano delivered another check in the amount of $396,000 from Big Sky made payable to the Avis & Archibald trust account, dated March 10, 1997. At

-4-

the same time, Mr. Durbano delivered a letter indicating that the February 26, 1997 escrow instructions applied to this deposit as well. Mr. Cherry credited file number 10327, the "Property File" with the deposit.

On April 8, 1997, Mr. Ogden told Mr. Cherry that Mr. Durbano had changed the escrow instructions and had approved the release of the funds. In fact, Mr. Durbano had not done so. After making one unsuccessful attempt to contact Mr. Durbano to confirm the purported change in the escrow instructions, Mr. Cherry disbursed the $396,000 to Mr. Ogden. Mr. Cherry testified that he felt "a lot of pressure" from Mr. Ogden to release these funds. Aplt's App. at 118 (depo. of Jayson Cherry).

About two weeks later, Robin Archibald, one of the principals of Avis & Archibald, discussed the Property File with Mr. Cherry. Apparently, a man named Teak Jones had been attempting to complete a transaction with Mr. Ogden and other investors via Avis & Archibald and had discovered a problem with the Property File. See Aplt's App. at 123 (depo. of Jayson Cherry); Aple's Supp. Index at 230 (unsigned statement of Jayson Cherry). Upon realizing Mr. Ogden had lied about Mr. Durbano's having changed the escrow instructions to authorize the release of the $396,000, Mr. Cherry telephoned Mr. Ogden and threatened to report him to state authorities if Mr. Ogden did not replenish the account "within several days." Aplt's App. at 123-24 (depo. of Jayson Cherry). Mr. Cherry did

not inform either Avis & Archibald's management or the investors of the erroneous disbursement.

In response to Mr. Cherry's demand for return of the funds, Mr. Ogden induced other investors to give him money. With these funds, Mr. Ogden intended to repay the $396,000 that he had received from the Property File. Between May 7 and May 14, 1997, Mr. Ogden obtained a total of $314,000 from four investors, who provided checks payable either to Mr. Ogden or to Avis & Archibald. The checks were deposited into the Property File. Additionally, Mr. Ogden convinced Mr. Cherry and his assistant to credit to the Property File with a $135,500 transfer initiated by Teak Jones. It is undisputed that Mr. Jones actually intended to deposit this money in his own account at Avis & Archibald.[2]

From the total of $449,500 that Mr. Ogden deposited in May 1997, Avis & Archibald returned $49,500 to Mr. Ogden and one of his investors. On May 23, 1997, Avis & Archibald returned $300,000 to Big Sky and $100,000 to Mr. Hazen.[3] See Aplt's App. at 130 (Check Register for Avis & Archibald's Big Sky Account). Big Sky was unaware that any of the funds had ever been disbursed to

---

[2]   In fact, in an apparent error, Avis & Archibald credited both the Property File and Mr. Jones's file (number 19765) with $135,000.

[3] It is unclear why Mr. Ogden returned $400,000, rather than $396,000, to Avis & Archibald. Under the original deal Mr. Ogden would have been required to return the $400,000 plus an additional $200,000, but since Avis & Archibald was only recovering the wrongly-released $396,000, the inclusion of the $4,000 loan fee is confusing at best.

Mr. Ogden. On June 13, 1997, Big Sky filed a civil action against Mr. Ogden for the remaining $200,000 of the $600,000 promissory note.

On June 16, 1997, Mr. Ogden's creditors filed an involuntary Chapter 7 bankruptcy petition against him. See 11 U.S.C. § 303(b). The bankruptcy court appointed Stephen R. Bailey as trustee to oversee the bankruptcy estate.

The trustee then filed adversary proceedings seeking to recover the $400,000 that Avis & Archibald had transferred to Big Sky and Mr. Hazen on May 23, 1997. The bankruptcy court granted the trustee's motion for summary judgment, ruling that the transfers were avoidable preferences under 11 U.S.C. § 547(b) and directing both Big Sky and Mr. Hazen to return the funds to the trustee. Big Sky appealed to the district court, while Mr. Hazen appealed to the Bankruptcy Appellate Panel for the Tenth Circuit (BAP).

In Big Sky's appeal, the district court affirmed the bankruptcy court, holding that Avis & Archibald was a commercial conduit under § 550(a)(1) and that the trustee could thus avoid the preferential transfer, regardless of Big Sky's good faith in accepting the funds from Avis & Archibald. See Big Sky Motors, Ltd., 2000 WL 33672946, at *10-11. In the case against Mr. Hazen, the BAP reached a contrary conclusion. The BAP held that Avis & Archibald was in a debtor/creditor relationship with Mr. Ogden and was an initial transferee under § 550(a)(1). See Hazen, 243 B.R. at 116-17. The BAP reversed the decision of the

bankruptcy court and remanded for a determination of whether Mr. Hazen received the funds in good faith as a "subsequent immediate or mediate transferee" such that he could defend against the trustee's action under the terms of 11 U.S.C. § 550(b).

## II. DISCUSSION

### A. Standard of Review

We review de novo the bankruptcy court's grant of summary judgment to the trustee, affording no deference to the district court's decision. See General Elec. Capital Corp. v. Manager of Revenue & Ex Officio Treasurer of the City of Denver (In re W. Pac. Airlines, Inc.), 273 F.3d 1288, 1291 (10th Cir. 2001). In adversary proceedings, Fed. R. Civ. P. 56 applies. See Fed. R. Bank. P. 7056. Thus, summary judgment is warranted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Under this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

B. Sections 547 and 550

In order to resolve this case, we must apply two sections of the Bankruptcy Code, 11 U.S.C. § 547 and 11 U.S.C. § 550. Generally, § 547 allows a trustee to avoid a preferential transfer of assets by a debtor-transferor to a creditor-transferee if certain conditions are met. This section thus allows a trustee to require the transferee to return assets to the estate so that they may be more equitably divided among all creditors. Section 550 provides a defense to some transferees who have acted in good faith, barring the trustee's recovery of assets when the transferee had no awareness of the debtor's pending bankruptcy.

Under both sections, the definition of a "transferee" is of central importance: the trustee may always recover assets from an "initial transferee." See 11 U.S.C. § 550(a)(1). However, assets may only be recovered from "any immediate or mediate transferee of such initial transferee" if the immediate or mediate transferee fails to take the asset "in good faith" and takes it with "knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(a)(2) and (b). In other words, an initial transferee is strictly liable to the trustee if the transaction is avoidable under § 547, but an entity that receives assets from an initial transferee in good faith and without knowledge of the avoidability of the transfer may assert a defense against the trustee. Nevertheless, courts construing these provisions have held that certain entities receiving the debtor's funds are not

"transferees" but rather "financial conduits."  See Rupp v. Markgraf, 95 F.3d 936,

939 (10th Cir. 1996); Bonded Fin. Servs. v. European Am. Bank, 838 F.2d 890,

893 (7th Cir. 1988).  Financial conduits are those entities that do not exercise

"dominion and control" over the funds.  Rupp, 95 F.3d at 939.

Two issues thus arise: (1) whether the transfer of funds is an avoidable

transfer under § 547(b); and (2) if so, whether the entity that received the funds is

a transferee or merely a financial conduit.  Big Sky asserts four general arguments

relating to these two issues, and we address them each in turn.


## C. The Avoidability of the Transfer

Section 547(b) of the Bankruptcy Code allows a trustee to avoid certain

transfers of assets that are deemed preferential to or for the benefit of a specific

creditor.  This provision has a dual purpose: it prevents individual creditors from

dismembering the assets of the debtor in a manner that negatively impacts other

creditors, and it allows all creditors to obtain a more equitable distribution of the

assets of the debtor.  See Gillman v. Scientific Research Prods., Inc. (In re Mama

D'Angelo, Inc.), 55 F.3d 552, 554 (10th Cir. 1995) (discussing § 547); H.R. Rep.

No. 95-595, at 177 (1977) (same).

Under the terms of § 547, a transfer is avoidable if it: (1) is of an interest of

the debtor in property; (2) is for the benefit of a creditor; (3) is made for or on

account of an antecedent debt owed by the debtor before the transfer was made; (4) is made while the debtor is insolvent; (5) is made on or within ninety days before the date the bankruptcy petition was filed; and (6) allows the creditor to receive more than the creditor would otherwise be entitled to receive from the bankruptcy estate. See 11 U.S.C. § 547(b); Jobin v. McKay (In re M & L Business Mach. Co., Inc.), 84 F.3d 1330, 1339 (10th Cir. 1996). "The burden of proving each of these elements rests on the trustee." Sender v. Johnson (In re Hedged-Investments Assocs., Inc.), 84 F.3d 1267, 1270 (10th Cir. 1996).

In the present context, it is undisputed that the transfer was made while Mr. Ogden was insolvent, that it was made within ninety days of the filing of the bankruptcy petition, and that the transfer would allow Big Sky to receive proportionately more than it would otherwise receive from the bankruptcy estate. Further, Big Sky acknowledges that, if there was a debt between Big Sky and Mr. Ogden, that debt would be an antecedent debt under § 547(b)(2). Therefore, Big Sky challenges only the district court's conclusions (1) that Mr. Ogden had a property interest in the funds returned to Big Sky via Avis & Archibald and (2) that Big Sky was a creditor of Mr. Ogden at the time of the purported preferential transfer. If Big Sky is persuasive on either of these arguments, then, the transfer is not in fact avoidable as a preferential transfer. However, Big Sky fails to

persuade us on either point.[4]

*1. Did Mr. Ogden Have An Interest In The Funds?*

Although the Bankruptcy Code defines neither the term "interest of the debtor in the property" nor "property," the Supreme Court has viewed the terms broadly in the bankruptcy context. In Begier v. I.R.S., 496 U.S. 53, 59 n.3 (1990), the Court recognized that § 547(b)'s "property of the debtor" is "coextensive with 'interests of the debtor in property' as that term is used in 11 U.S.C. § 541(a)(1)." "Section 541(a)(1) provides that the 'property of the estate' includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'"

---

[4] Both the district court in the instant case and the BAP in Mr. Hazen's case held that these elements of § 547(b) were satisfied such that an avoidable transfer occurred. Although Big Sky seeks to challenge the district court's ruling on this matter, it fails to cite any law in support of its arguments other than one reference to 11 U.S.C. § 547, see Aplt's Br. at 23, and one reference to 11 U.S.C. § 547(b), see id. at 26. Thus, Big Sky's brief fails to comply with the Federal Rules of Appellate Procedure, which require an appellant's argument to contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A) (emphasis added).

When an appellant is represented by counsel on appeal, as is the case here, and when there are multiple decisions arising out of the present factual setting which cite relevant case law directly on topic, we are reluctant to consider arguments that do not contain legal support for their contentions. Cf. LINC Fin. Corp. v. Onwuteaka, 129 F.3d 917, 922 (7th Cir. 1997) (concluding that an appellant's "utter failure to produce single case or statute supporting nonjurisdictional arguments in appellate brief waived nonjurisdictional arguments"). Nevertheless, we proceed with the discussion of this issue only "[t]o avoid any appearance that we are sacrific[ing] substantive justice on the altar of administrative convenience." Id. (internal quotation marks omitted).

-12-

Id. (quoting § 541(a)(1)); see also Danning v. Bozek ( In re Bullion Reserve of N. Am.), 836 F.2d 1214, 1217 (9th Cir. 1988) ("'[P]roperty of the debtor' subject to [§ 547(b)] is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.").

For purposes of most bankruptcy proceedings, "[p]roperty interests are created and defined by state law." Butner v. United States , 440 U.S. 48, 55 (1979); Taylor v Rupp (In re Taylor) , 133 F.3d 1336, 1341 (10th Cir. 1998) ("The existence and extent of [the debtor's interest in the property] is determined by state law"). "Once that state law determination is made, however, we must still look to federal bankruptcy law to resolve" the extent to which that interest is property of the estate. Rine & Rine Auctioneers, Inc. v. Myers (In re Rine & Rine Auctioneers, Inc.) , 74 F.3d 854, 857 (8th Cir. 1996).

In the instant case, we must thus determine whether Mr. Ogden, as a debtor, had a legal interest in the funds transferred to Avis & Archibald with the purpose of repaying the Big Sky account. We must resolve this question with regard to two types of funds: (1) the $135,500 transfer from Teak Jones that Mr. Ogden deceptively directed Avis & Archibald employee Mr. Cherry to credit to the Big Sky Property File on May 8, 1997 ("the Teak Jones funds"); and (2) the funds from various individuals and entities—totaling $314,000—that Mr. Ogden caused

-13-

to be deposited in Big Sky's Property File between May 7 and May 14, 1997. This second group of funds was transferred to Avis & Archibald with the requisite consent of the respective individuals and entities.

Here, there is no dispute as to the second group of funds. Big Sky admits that Mr. Ogden had an interest in them. See Aplt's Br. at 27. Accordingly, we focus on the $135,000 that Mr. Ogden obtained from Teak Jones.

As to those funds, we agree with both the district court and the BAP in the Hazen case that, if Mr. Ogden's representations allowed him to obtain the funds through fraud, Utah law deems Mr. Ogden to have obtained a legally recognized interest of defeasible title in those funds. See Merrill v. Dietz ( In re Universal Clearing House Co.) , 62 B.R. 118, 124 (D. Utah 1986) (noting that one "who obtains property by fraud may transfer good title to a bona fide purchaser" and thus has "defeasible title" in that property). If Mr. Ogden had defeasible title, then the funds are property of the estate such that Mr. Ogden had an interest in them for purposes of § 547(b). See 5 Alan N. Resnick, Henry S. Sommer, & Lawrence P. King, Collier on Bankruptcy ¶ 547.03[2], at 547-21 ("The fundamental inquiry is whether the transfer diminished or depleted the debtor's estate"), 547-21 n.23 (citing cases) (15th ed. rev. 2002).

In Utah, nine elements must be satisfied by clear and convincing evidence in order to succeed on a claim for fraud:

(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

Mikkelson v. Quail Valley Realty, 641 P.2d 124, 126 (Utah 1982).

All evidence presented by the parties indicates that Mr. Ogden had no legitimate claim on the Teak Jones funds and that Mr. Ogden's representations to Avis & Archibald regarding the destination of the funds were false. Hence, it is clear that the first four elements are satisfied by Mr. Ogden's attempt to convince Mr. Cherry to credit the Teak Jones funds to Big Sky's Property File. Because it is undisputed that Mr. Ogden's representations caused Avis & Archibald to act in reliance on the false representations, the fifth through eighth elements are also satisfied. Accordingly, the only element at issue is the ninth one: whether the crediting of the Teak Jones funds to Big Sky's Property File injured or damaged Mr. Jones or Avis & Archibald.

As to that element, the record establishes that both Avis & Archibald and Mr. Jones incurred an injury. In particular, because Mr. Ogden pressured Mr. Cherry, Avis & Archibald credited these funds to the Big Sky Property File immediately after receiving the wire transfer. See Aplt's App. at 126, 130. Avis & Archibald also credited these funds to Mr. Jones's account. See id. at 146

-15-

(deposition of Robin L. Archibald).  As a result, Avis & Archibald filed an insurance claim to recover the amount.  As to Mr. Jones, we note that the initial crediting of the Big Sky account temporarily prevented him from exercising control over the funds.  Avis & Archibald's filing of an insurance claim and Mr. Jones's temporary loss of control over the funds both constitute sufficient injury to satisfy the final element of a fraud claim under Utah law. [5]

---

[5] Our conclusion contrasts to that of the BAP in Mr. Hazen's case.  See Hazen 243 B.R. at 114.  There, the BAP concluded that "no evidence [presented] supports the conclusion that Avis & Archibald reasonably relied on [Mr. Ogden's] representation [about the Teak Jones funds.]"  Id.  Thus, the trustee had failed to support one of the essential elements of a fraud claim under Utah law, and as a result, he could not establish that Mr. Ogden had an interest in the Teak Jones funds.

In contrast, in the instant case, the district court concluded that "[Mr.] Ogden's investors did not know their funds would be directed to Avis & Archibald and ultimately Big Sky . . . . [Mr.] Ogden's investors became creditors as a result of Ogden's fraudulent acquisition of the funds.  Consequently, [Mr.] Ogden gained sufficient rights in the money he obtained from them."  See Big Sky, 2000 WL 33672946, at *4.

Big Sky argues in conclusory fashion that there are factual disputes as to Mr. Ogden's interest in these funds, and that, as a result, the bankruptcy court erred in granting summary judgment to the trustee.  See Aplt's Br. at 26.  However, Big Sky offers no legal authority or specific citation to the record to support this argument.

Moreover, as to the Teak Jones funds, the record supports the conclusion that Mr. Cherry did reasonably rely upon Mr. Ogden's representations.  In particular, Mr. Cherry testified that during this period, Mr. Ogden instructed him to "[w]atch for the [Teak Jones] wire."  See Aplt's App. at 125-27.  Mr. Cherry had been receiving deposits from various investors directed to the Property File, and knew of Mr. Jones's previous involvement with Mr. Ogden.  Further, nothing on the face of the wire transfer—other than a note indicating the transfer was "RE: TEAK JONES"—has been shown to this court to indicate that the

(continued...)

-16-

We are not persuaded by Big Sky's contention that Mr. Ogden's alleged purpose in obtaining funds from Mr. Jones and the other investors—allowing Avis & Archibald to return Big Sky's and Mr. Hazen's initial investments—establishes that Mr. Ogden did not have an interest in these funds.

As a general rule, under § 547(b), a debtor's transfer of borrowed funds constitutes a preferential transfer of the debtor's property, assuming the other elements of that section are met.      See Matter of Smith  , 966 F.2d 1527, 1537 (7th Cir. 1992) ( "When a debtor effectively borrows nonearmarked funds and exercises control by using the funds to pay a preferred creditor over others, the estate has been diminished."). Here, it was Mr. Ogden who induced Big Sky and Mr.  Hazen to invest in the purported scheme.  There is no indication that Mr. Jones or any other investor had designated the purpose of the investment as repaying Big Sky.    Cf.  Adams v. Anderson (In re Superior Stamp & Coin Co., Inc.) , 223 F.3d 1004, 1008-09 (9th Cir. 2000) (noting exception to preferential transfer under "earmarking doctrine" where a third party lends money to the debtor for the specific purposes of paying a selected creditor).  Thus, we hold that

---

[5](...continued)
instrument itself contradicted Avis & Archibald's actions in crediting the funds to Big Sky's Property file.  See id. at 17 (Zions Bank Wire Transfer).  Indeed, the section of the form for special handling instructions is blank.  See id.  At the very least, Big Sky has not indicated what, if anything, on the face of the transfer would counter Mr. Ogden's representations regarding the destination of the transfer.

Mr. Ogden retained an interest in both the funds he fraudulently obtained from Mr. Jones and the funds he obtained from other investors.      See In re Universal Clearing House Co.   , 62 B.R. at 124 (noting that a debtor may have a legally recognized interest in funds obtained by fraud).

### 2. Was Big Sky A Creditor?

The Bankruptcy Code defines "creditor" broadly to mean an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A claim is similarly defined in broad terms by the Code as a:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

The Supreme Court has indicated that in relation to bankruptcy proceedings, Congress intended "to adopt the broadest available definition of [the term] 'claim.'" See Johnson v. Home State Bank, 501 U.S. 78, 83 (1991). Here, then, the issue is whether Big Sky had any kind of right to payment from Mr. Ogden on account of the unauthorized disbursement of funds; if so, then Big Sky was a creditor of Mr. Ogden.

-18-

While federal law determines when claim arises for bankruptcy purposes, see id. (holding that the question of whether an interest is a claim for bankruptcy purposes is "to be resolved by reference to 'the text, history, and purpose' of the Bankruptcy Code") (internal quotation marks omitted), non-bankruptcy substantive law usually determines the existence of a claim. See Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, . . . Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law") (internal quotation marks omitted); Pearson v. Salina Coffee House, Inc., 831 F.2d 1531, 1533 (10th Cir. 1987) (noting that state law determined the validity and effect of liens in bankruptcy proceedings). We thus look to Utah law to determine whether Big Sky had a claim on the funds improperly disbursed by Avis & Archibald to Mr. Ogden. We hold that Big Sky had such a claim under the Utah law of conversion.[6]

In Utah:

[a] conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession. . . . Although conversion results only from intentional conduct it does not however require a conscious wrongdoing, but only an intent to exercise dominion or control over the

---

[6] Although Big Sky presumably had both tort and contract rights that may have been violated with respect to the funds, we chose to address only the tort claim as it was the emphasis of the court below.

goods inconsistent with the owner's right.

Allred v. Hinkley, 328 P.2d 726, 728 (Utah 1958).  Further, although in many circumstances money cannot be the subject of an action for conversion, "misappropriated funds placed in the custody of another for a definite application" may be the subject of an action for conversion.  Utah v. Twitchell, 832 P.2d 866, 870 (Utah Ct. App. 1992) (citing and quoting with approval Boyd v. Wimes, 664 S.W.2d 596, 599 (Mo. Ct. App. 1984)).  Here, because Mr. Ogden intended to exercise dominion and control over funds that Big Sky intended for a specific purpose and because Mr. Ogden actually interfered with Big Sky's control over these funds, Big Sky could assert a conversion claim against Mr. Ogden.

In spite of the fact that it had a conversion claim against Mr. Ogden under Utah law, Big Sky contends that it was not a creditor because it did not know of the debt owed by Mr. Ogden and because it did not consent to the release of its funds.  In support of this argument, Big Sky observes that the initial loan transaction was not completed as contemplated, that the terms of the written escrow instructions were not fulfilled, and that Avis & Archibald's disbursement of funds to Mr. Ogden was wrongful.

Although these facts are not disputed, they do not undermine the conclusion that Big Sky was Ogden's creditor under the provisions of the Bankruptcy Code. As the district court recognized, "in a preference analysis, it is generally the effect

-20-

of the transaction, rather than the debtor or creditor's intent, that is controlling." See Big Sky Motors, Ltd. , 2000 WL 33672946, at * 5 (citing Barach v. Pub. Fin. Corp., 685 F.2d 504, 510 (7th Cir. 1981); H.R. Rep. No. 595, 95th Cong., 1st Sess,. 177-78 (1977)). Accordingly, even though Big Sky only intended that Mr. Ogden receive the funds upon the satisfaction of the escrow conditions, when Avis & Archibald released the funds to Mr. Ogden, Mr. Ogden owed a debt to Big Sky, and Big Sky became a creditor with a conversion claim against Mr. Ogden. See id. *5-6.

Big Sky's emphasis on the fact that the transfer occurred in two stages (i.e. transfers of funds from Mr. Ogden to Avis & Archibald followed by the transfer from Avis & Archibald to Big Sky) is also unavailing. Big Sky suggests that this fact somehow shields the transaction from being deemed an avoidable preferential transfer under § 547. To assert this argument, however, is to beg the ultimate question of whether Avis & Archibald was acting as a financial conduit or as an initial transferee, which we will discuss below. Furthermore, § 547 does not differentiate between one-step and two-step transactions. Cf. Rupp, 95 F.3d at 939-40 (discussing the difference between one-step and two-step transactions for purposes of § 550(b)). We therefore conclude that Big Sky is a creditor under 11

U.S.C. § 101(10)(A).[7]


D. The Identity of the Initial Transferee

Big Sky further argues that, under section 550 of the Bankruptcy Code, Avis

& Archibald–rather than Big Sky–that was the initial transferee of the disputed

funds.  As a result, Big Sky maintains, the bankruptcy court and the district court

---

[7] As the district court acknowledged, an owner of property may elect to stand on his rights as an owner—rather than his rights as a creditor.  See Aplt's App. at 87 (citing 5 Collier on Bankruptcy ¶ 547.02[3]).  The owner may demand the return of the property, "rescinding the transaction in which the fraud or breach of trust was committed and ask[ing] for restoration of his property."  Id. If the owner so elects, the return of the property will not constitute a preferential transfer because the return of the property will not result in the diminution of the debtor's estate.  Id.  However, an owner may pursue this option only if the property may be traced or identified.

Here, although it appears that Big Sky sought to rescind the transaction after it discovered that it was failing, Big Sky cannot dispute that the funds it sought to recover could not be reasonably traced or identified.  See Johnson v. Morris, 175 F.2d 65, 67 (10th Cir. 1949) ("It is thus not sufficient for one seeking a preference to merely show that his property was wrongfully taken by the bankrupt, co-mingled with his other assets and used in his business.  He must trace his property in its original or converted form into specific or identifiable property in the possession of the receiver.") (internal quotation marks omitted). Unfortunately for Big Sky, "[i]t is not enough to show that the . . . funds went into the assets of the bankrupt, but it must be further shown that such funds came into the possession of the trustee either in their original form or in a converted form of one kind or another."  Id. at 68.  As the district court observed, because Big Sky cannot trace the funds that were disbursed to Mr. Ogden, Big Sky must proceed as a general creditor of Mr. Ogden.  See Big Sky Motors, Ltd. , 2000 WL 33672946, at * 5-6.

-22-

erred in refusing to allow it to present evidence of its good faith.

As we have noted, section 550 makes both the initial transferee of a preferential transfer and "the entity for whose benefit the [preferential] transfer was made" strictly liable to the bankruptcy estate for the value of the preferential transfer. See 11 U.S.C. § 550(a)(1). [8] In contrast, an immediate or mediate transferee of an initial transferee may be able to assert the good faith defense. See 11 U.S.C. § 550(a)(2) and (b)(1). The Bankruptcy Code, however, does not define the term "initial transferee."

Accordingly, the courts have sought to define the term. This circuit, like several others, has adopted a "dominion and control" test. See Malloy v. Citizens Bank of Sapulpa ( In re First Sec. Mortgage Co.) , 33 F.3d 42, 44 (10th Cir. 1994) (adopting test from Bonded Financial Services v. European American Bank , 838 F.2d 890, 893 (7th Cir. 1988)). Under that test, "the minimum requirement of status as a transferee [under § 550] is dominion over the money or other asset, the right to put the money to one's own purposes." Bonded , 838 F.2d at 893; accord Rupp , 95 F.3d at 939-41 (applying the dominion and control test and stating that "[t]he term 'transferee' 'must mean something different from 'possessor' or 'holder' or 'agent,' or 'anyone who touches the money'") (quoting Bonded , 838

---

[8] The trustee has not argued that Big Sky was the entity "for whose benefit [the] transfer was made," 11 U.S.C. § 550(a), and so we address only whether Avis & Archibald was an initial transferee.

-23-

F.2d at 894).

Under this approach, "those who act as mere 'financial intermediaries,' 'conduits' or 'couriers' are not initial transferees under § 550." Rupp, 95 F.3d at 941 (citing Bonded, 838 F.2d at 893); see also Christy v. Alexander & Alexander of New York, Inc. (In re Finley Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey), 130 F.3d 52, 57 (2d Cir. 1997) (rejecting the contention that "couriers and other mere conduits" constitute initial transferees under § 550); Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1201 (11th Cir. 1988) (affirming a bankruptcy court's determination that a bank "never became any kind of transferee of this debtor under any view of § 550" because "bank was a conduit that credited [an] account with the transferred funds expressly earmarked for that purpose") (internal quotation marks omitted). Although these intermediaries, couriers, and conduits may have physical control over the disputed funds at some point, they are generally deemed not to be transferees under § 550 because they lack the necessary legal dominion and control over the funds. See Bowers v Atlanta Motor Speedway, Inc. (In re Southeast Hotel Props. Ltd. P'ship), 99 F.3d 151, 156 (4th Cir. 1996) (" To hold that a party needs only physical dominion and control over the funds to constitute an 'initial transferee' is to hold every agent or principal of a corporation to be the initial transferee when he or she effects a transfer of property in his or her

-24-

representative capacity. As stated by the court in Bonded . . . the term 'transferee' as used in § 550 'must mean something different from 'possessor' or 'holder or 'agent.'" (quoting Bonded, 838 F.2d at 894)).

With regard to the funds at issue here, the BAP (in the trustee's action to recover the transfer to Mr. Hazen's case) and the district court (in this appeal of the trustee's claim against Big Sky) reached contrasting conclusions as to the status of the Avis & Archibald and Big Sky. Those courts based their conclusions on differing views of the dominion and control test.

In the action against Mr. Hazen, the BAP concluded that Avis & Archibald was not merely a financial conduit but rather "had legal control over the funds [received from Mr. Ogden] when [it] put them into [its] trust account and subsequently segregated the funds into the Property File." Hazen, 243 B.R. at 116. As a result, the BAP concluded, Avis & Archibald was the initial transferee under § 550, and, as a "subsequent immediate or mediate transferee," id. at 117, Mr. Hazen should be allowed to assert a good faith defense to the trustee's action to avoid the transfer.

In contrast, in the instant case—the trustee's action against Big Sky—the district court held that Avis & Archibald "did not exercise the requisite dominion and control over the funds as the initial transferee; it merely held the funds in escrow as a financial intermediary until Big Sky exercised its rightful dominion

-25-

and control over the account and requested the funds be returned." Big Sky, 2000 WL 33672946, at *10. In the district court's view, Big Sky—not Avis & Archibald—was the initial transferee of the disputed funds, and, as an initial transferee, Big Sky could not assert a good faith defense.

In this appeal, Big Sky contends that this court should adopt the BAP's characterization of Avis & Archibald as an initial transferee with dominion and control over the funds. In support of this view, Big Sky points to Avis & Archibald's improper disbursement of the $396,000 to Mr. Ogden on April 8, 1997. Big Sky reasons that this disbursement made Avis & Archibald a creditor of Mr. Ogden's. When Mr. Ogden transferred funds back to Avis & Archibald, the company extinguished both "a direct claim held by the title company against Mr. Ogden based upon his own fraud" and a claim held by Big Sky against Avis & Archibald for breaching its fiduciary duty in disbursing the funds to Mr. Ogden. See Aplt's Br. at 18. According to Big Sky, because Avis & Archibald induced the transfer of funds from Mr. Ogden and because the company directly benefitted from that transfer, the company exercised the necessary dominion and control to constitute an initial transferee under § 550.

In our view, Big Sky defines "dominion and control" more broadly than our precedent allows. In Rupp, this circuit expressly rejected the argument that one who merely directs another "to make the transfer in the first place" exercises the

-26-

necessary dominion and control to constitute a transferee under § 550.  We wrote:

> The issue under § 550 is to what extent the principal, or anyone else for that matter, exercised control over the disputed funds *after* the funds left the debtor. Determining the *initial transferee* of a transaction is necessarily a temporal inquiry; there must be a transfer before there can be a transferee.  <u>The extent to which a principal has de facto control over the debtor before the funds are transferred from the debtor, and the extent to which the principal uses this control for his or her own benefit in causing the debtor to make a transfer, are not relevant considerations in determining the initial transferee under § 550.</u>

Rupp, 95 F. 3d at 941 (emphasis added).  Thus, contrary to Big Sky's interpretation of the dominion and control test, the fact that Avis & Archibald caused Mr. Ogden to transfer the disputed funds and received some benefit from this transfer is insufficient to establish that Avis & Archibald had dominion and control over those funds.

Rather than focusing on the cause of the disputed transfer or the party that benefitted from it, our decision in Rupp provides that "'[i]n order to be a transferee of the debtor's funds, one must (1) actually receive the funds and (2) have <u>full</u> dominion and control over them for one's own account, <u>as opposed to receiving them in trust or as agent for someone else</u>.'"  Id. at 942 (quoting Richardson v. FDIC (In re M. Blackburn Mitchell Inc.), 164 B.R. 117, 127 (Bankr. N. D. Cal. 1994) and stating that "we find that Richardson's interpretation of [the dominion and control test set forth in] Bonded under these circumstances is

persuasive ") (emphasis added). Applying this interpretation, we agree with the district court that the record here does not support Big Sky's contention that Avis & Archibald had dominion and control over the disputed funds.

In particular, both Mr. Ogden and Mr. Cherry (the Avis & Archibald officer handling the transaction) testified that, when Mr. Ogden transferred the disputed funds to Avis & Archibald, Mr. Ogden intended that the funds be credited to the Big Sky Property File.   See Aple's Supp. App at 185; 238.  Moreover, as an escrow agent governed by Utah law,  Avis & Archibald was obligated to follow Mr. Ogden's instructions concerning the disposition of the funds.    See Utah Stat. Ann. § 31A-23-307(3)(a) and (b) (stating that funds deposited with the agent "are not subject to any debt of the agent" and "may only be used to fulfil the terms of the individual escrow under which the funds were accepted").

This testimony, which is not challenged by Big Sky in this appeal, demonstrates that Avis & Archibald did   not have "full dominion and control over [the funds received from Mr. Ogden] for [its] own account.     Rupp, 95 F.3d at 942 (quoting  Richardson , 164 B.R. at 127) (emphasis added).  Thus, unlike those entities deemed transferees under    Bonded 's dominion and control test, Avis & Archibald was not "free to invest [the funds] in lottery tickets or uranium stocks" or any other endeavor.    Bonded , 838 F.2d at 894.  Instead, Avis & Archibald "'receiv[ed] [the funds] in trust or as agent for someone else'" (      i.e. , Big Sky).

Rupp, 95 F.3d at 942 (quoting Richardson, 164 B.R. at 127); see also Finley, Kumble, 130 F.3d at 58 ("a commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction, is not an initial transferee within the meaning of § 550(a)(1)"); Brunson v. Sec. First Nat'l Bank (In re Coutee), 984 F.2d 138, 140-41 (5th Cir. 1993) (holding that a law firm receiving funds for a client was not an initial transferree because "[t]he firm's role with respect to the received money was to accept the funds in settlement of its client's case, deposit the money in trust, keep as fees only what the [the clients] agreed to, and pay the rest to the bank on behalf of the [clients] in satisfaction of their loan"); Danning v. Miller (In re Bullion Reserve of N. Am.), 922 F.2d 544, 548-49 (9th Cir. 1991) (holding that because the recipient of funds had a contractual obligation to immediately transfer them, he was not an initial transferee under § 550, even though the funds were eventually used to purchase stock in his name).

In arguing that Avis & Archibald possessed the necessary dominion and control over the disputed funds, Big Sky observes that Avis & Archibald actually received more from Mr. Ogden and his investors than the $396,000 that had been disbursed to Mr. Ogden on April 8, 1997. See Aplt's Br. at 21-22; see also Hazen, 243 B.R. at 109 n.8 (noting that "[n]ot all of the 'returned' funds were left in the

-29-

Avis & Archibald trust account: [Mr. Ogden] personally took $9,500 and the Debtor had Avis & Archibald disburse $40,000 to Dennis Nelson"). According to Big Sky, Avis & Archibald thus "had to make the decision of what to do with those funds," Aplt's Br. at 20, and, by deciding to deposit funds in the Big Sky Property File, Avis & Archibald demonstrated its right to the funds, and thus its status as a transferee.

Again, Big Sky reads our dominion and control test too expansively. The fact that Avis & Archibald could have used its physical control over the funds to put them to some other use than Mr. Ogden intended does not distinguish the company from many other financial conduits—who may be able to prevent another entity from exercising dominion and control by becoming "an unfaithful courier." See Rupp, 95 F.3d at 941. As we noted in Rupp, "[a]ll couriers have this type of control. In contrast, the dominion and control test from Bonded requires control over the funds and the right to put those funds to one's own purpose, not merely the ability to prevent someone else from doing so." Id.

We acknowledge that, on first blush, it may seem inequitable to require Big Sky to repay funds to the estate when it was Mr. Ogden's deception that caused the funds to be released in the first place. While this turn of events is unfortunate, we note that deceptive debtors often leave parties without the benefit of the use of their assets. Indeed, Mr. Ogden's other investors actually provided the funds in

-30-

dispute in this case. The only evidence provided suggests that Big Sky's initial $296,000 was otherwise disposed of by Mr. Ogden. Hence, the investors brought in by Mr. Ogden to repay Avis & Archibald lost money as a result of Mr. Ogden's behavior, just as Big Sky did. We do not think that it is inequitable to make Big Sky bear the risk of the fraudulent nature of this transaction rather than Mr. Ogden's other creditors in bankruptcy. See Rupp, 95 F.3d at 944 (noting that "[i]n most, if not all, bankruptcy cases someone is going to be injured" and that "[t]his is especially true when there has been a fraudulent transfer of the debtor's funds"). "In any event, Congress has made its own judgment of who should bear the risk of loss under these situations when it enacted Section 550, and we are bound to accept that judgment." Id.

## III. CONCLUSION

For the aforementioned reasons, the rulings of the district court and the bankruptcy court are AFFIRMED.