**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

GENERATION RESOURCES HOLDING
COMPANY, LLC,

    Debtor.

------------------------------

ERIC C. RAJALA, Trustee for Generation
Resources Holding Company, LLC,

    Plaintiff-Appellee,

v.

SPENCER FANE LLP,

    Defendant-Appellant.

_____

GENERATION RESOURCES HOLDING
COMPANY, LLC,

    Debtor.

------------------------------

ERIC C. RAJALA, Trustee for Generation
Resources Holding Company, LLC,

    Plaintiff-Appellee,

v.

HUSCH BLACKWELL LLP,

    Defendant-Appellant.

_____

No. 19-3226

No. 19-3227

**Appeal from the United States Bankruptcy Court
for the District of Kansas
(18-06016)**

_____

Carolyn J. Fairless, Wheeler Trigg O'Donnell LLP, Denver, Colorado (John J. Cruciani, Husch Blackwell LLP, Kansas City, Missouri; Eric L. Johnson, Spencer Fane LLP, Kansas City, Missouri; Andrew W. Lester, Spencer Fane LLP, Oklahoma City, Oklahoma; James D. Griffin, Scharnhorst Ast Kennard Griffin PC, Kansas City, Missouri, with her on the briefs), for Defendants-Appellants Husch Blackwell LLP and Spencer Fane LLP.

Michael P. Healy, The Healy Law Firm, L.L.C., Lee's Summit, Missouri (Eric C. Rajala, Overland Park, Kansas, with him on the brief), for Plaintiff-Appellee Eric C. Rajala.

_____

Before **LUCERO**, **HOLMES**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Eric C. Rajala, the bankruptcy trustee for Generation Resources Holding Company, LLC ("Generation Resources"), initiated separate adversary proceedings against Spencer Fane LLP ("Spencer Fane") and Husch Blackwell LLP ("Husch Blackwell") (collectively, "the firms") to recover legal fees he alleges are proceeds of a fraudulent transfer. The bankruptcy court denied the firms' motions to dismiss, but then certified the decisions for immediate appeal. We consolidated the appeals and agreed to hear them on an interlocutory basis.

Because the firms are not "transferees," as that term is used in 11 U.S.C. § 550, we reverse and remand with instructions to dismiss Mr. Rajala's adversary complaints. Consequently, Mr. Rajala may not recover the fees from the firms.

2

## I. BACKGROUND

### A. *Factual History*[1]

Generation Resources developed three wind power projects in Pennsylvania, known as Stonycreek, Forward, and Lookout. In February 2004, Generation Resources entered discussions with Edison Capital about selling the projects. To complete the purchase, Edison Capital "require[ed] each project to be a separate subsidiary of" Generation Resources. App., Vol. I at 16. In response, insiders at Generation Resources formed (at different times) Stonycreek Windpower, LLC, Forward Windpower LLC, and Lookout Windpower, LLC.

In April of 2005, Generation Resources and Edison Capital exchanged a draft letter of intent. The letter represented that Generation Resources was the developer of each of the three projects.

On or about May 11, 2005, Generation Resources and Edison Capital relabeled the draft letter of intent as a memorandum of understanding ("MOU"). Under the MOU, Edison Capital would acquire the right to construct the three projects in exchange for "additional development loans, repayment of sunk costs, and payment of developer fees" to Generation Resources upon the arrival of a "commercial operation date." App., Vol. I at 19. Edison Capital required that Generation Resources' creditors agree to the MOU before it would move forward with the deal.

---

[1] Record citations are to filings by and against Spencer Fane (appeal No. 19-3226). Mr. Rajala's adversary proceeding against Husch Blackwell (appeal No. 19-3227) proceeded in an identical procedural posture in all relevant respects.

The insiders obtained the creditors' approval and promised that "their debts would be repaid before anyone else received a dime." App., Vol. I at 20. On July 18, 2005, Generation Resources and Edison Capital executed the MOU, which represented that Generation Resources was the "sole developer" of the three projects. App., Vol. I at 20.

At some point it became clear to everyone involved that the Stonycreek project would not go forward. On November 28, 2005, the insiders created Lookout Windpower Holding Company, LLC ("LWHC") and Forward Windpower Holding Company, LLC ("FWHC"). Sometime on or after November 28, 2005, Generation Resources was no longer able to pay its debts.

On December 1, 2005, the insiders circulated among themselves revised development agreements, one for each project. The revised agreement for the Lookout project named LWHC as the developer, and the revised agreement for the Forward project named FWHC as the developer. These revisions had the effect of transferring Generation Resources' right to costs and fees under the MOU to LWHC and FWHC.

As of December 14, 2005, however, the Generation Resources website still represented that Generation Resources was the developer of all three projects. And on December 16, 2005, the insiders told some creditors that Generation Resources was abiding by the terms of the MOU. On January 6, 2006, those creditors agreed to extend the maturity date of their loans.

On February 3, 2006, the deal based on the revised development agreements closed between Generation Resources and Edison Capital. Edison Capital then assumed the development costs of the projects. The insiders knew that Generation Resources could

4

not survive without the proceeds contemplated by the MOU, but Generation Resources nevertheless delayed declaring bankruptcy to benefit LWHC and FWHC.

On March 5, 2007, the insiders and Edison Capital exchanged emails that contemplated a $13 million payment for both the Lookout and Forward projects. The insiders pressured Edison Capital to divide the redemption agreement into separate agreements for each project and to prioritize payments to LWHC and FWHC. Edison Capital emailed a draft redemption agreement to that effect, proposing the $13 million payment be divided: $1,493,000 for the Forward project and $11,507,000 for the Lookout project. On March 28, 2017, various persons/entities[2] signed redemption agreements for the Lookout project and the Forward project, reflecting the insiders' preferred sequence of payments.

On December 31, 2007, Generation Resources defaulted on its obligations to some of its creditors. Those creditors sued Generation Resources and obtained a judgment for $2.625 million.

## B. *Procedural History*

On April 28, 2008, Generation Resources filed for Chapter 7 bankruptcy protection in the District of Kansas, and the court appointed Mr. Rajala as trustee.

---

[2] Mr. Rajala's complaints do not specify which entities signed the redemption agreements.

## 1. The Pennsylvania Litigation

On or about November 10, 2008, LWHC asserted the Lookout project was operational and demanded a final payment from Edison Capital. Edison Capital unilaterally reduced the payment from $10,507,000 to $5,514,460.30 "due to delays in construction and increased costs attributable to LWHC." App., Vol. I at 28.

LWHC disputed the reduction in fees, and in December 2008, hired Husch Blackwell under a contingent fee agreement to sue Edison Capital for the remaining balance.

On April 8, 2009, Mr. Rajala sent Husch Blackwell a written notice that LWHC's claims against Edison Capital sought funds that belonged to Generation Resources' bankruptcy estate. Mr. Rajala based the estate's claim to the funds on a theory that Generation Resources' transfer of its right to payment of the development fees to LWHC was fraudulent.

On April 17, 2009, Husch Blackwell filed a lawsuit against Edison Capital on LWHC's behalf in federal district court in Pennsylvania. Edison Capital successfully moved for a preliminary injunction that blocked LWHC from selling the Lookout project in a foreclosure sale. The motion was based in part on the theory that the unpaid balance in the Lookout redemption agreement was property of Generation Resources' bankruptcy estate.

In May 2011, Mr. Rajala tried unsuccessfully to enjoin LWHC from pursuing its lawsuit in Pennsylvania. After the Pennsylvania district court denied the motion, it held a trial and entered a $9 million judgment against Edison Capital in LWHC's favor. The

6

Pennsylvania district court then transferred enforcement of that judgment to the court overseeing Generation Resources' bankruptcy to determine "whether the judgment, partially or completely, is part of the bankruptcy estate." App., Vol. I at 30–31. Edison Capital deposited funds in satisfaction of the Pennsylvania district court judgment into the bankruptcy court's registry.

## 2. Attempts to Enforce the Pennsylvania Judgment

On April 25, 2011, Spencer Fane entered an appearance in the bankruptcy case on behalf of LWHC, FWHC, and the insiders. Spencer Fane asked the bankruptcy court to exclude the property-of-the-estate issue, as framed by the Pennsylvania district court, from the bankruptcy proceedings. On September 2, 2011, the bankruptcy court granted that request.

Spencer Fane further moved for a determination that the $9 million judgment was not property of the bankruptcy estate because Mr. Rajala had not yet succeeded on a fraudulent transfer claim. On April 9, 2012, the bankruptcy court ordered the $9 million judgment be distributed to LWHC, ruling that, if Mr. Rajala "prevails on his fraudulent transfer claims, he then has the remedy of avoiding the fraudulent transfer." App., Vol. I at 32. The bankruptcy court denied Mr. Rajala's request to certify its ruling for an interlocutory appeal.

### 3. Distribution of the Pennsylvania Judgment

On May 8, 2012, the bankruptcy court released the $9 million, with most of the funds going to a bank account controlled by LWHC.[3] The next day, LWHC distributed the deposited funds to five different recipients, including $369,967 to Spencer Fane and $1,874,949.96 to another bank account controlled by LWHC.

On May 31, 2012, Mr. Rajala tried unsuccessfully to enjoin dissipation of the distributed funds. Mr. Rajala then appealed the denial of that motion, but we affirmed. *Rajala v. Gardner*, 709 F.3d 1031, 1039 (10th Cir. 2013).

Meanwhile, the insiders further distributed the funds in the second LWHC bank account: $150,000 to Spencer Fane and $1,723,000 to a third bank account in the Cayman Islands. Of those funds transferred to the third bank account, the insiders distributed $875,000 to Husch Blackwell and an additional $150,000 to Spencer Fane through an intermediary bank. Between January 2013 and February 2016, the insiders made a series of additional payments ($18,000, $20,000, and $14,600) to Spencer Fane from the $9 million original distribution to LWHC. Mr. Rajala is unable to account for $698,000 of the original $9 million.

### 4. Avoidance of Transaction with LWHC

Mr. Rajala brought fraudulent transfer claims against the insiders, LWHC, and FWHC. *See Rajala v. Gardner*, 661 F. App'x 512, 515 (10th Cir. 2016). The bankruptcy

---

[3] Some of the funds were distributed to a bank account controlled by Generation Resources' financial adviser. Mr. Rajala does not allege that any of those funds ended up in the firms' possession.

court entered summary judgment in favor of the defendants. *Id.* at 514–15. We reversed. *Id.* at 518.

The parties then negotiated a settlement. On May 2, 2017, the bankruptcy court approved a consent judgment between Mr. Rajala and the insiders to avoid the transfers of Generation Resources' property interests in the Lookout project to LWHC and in the Forward project to FWHC. The consent judgment empowered Mr. Rajala to recover $9,941,448 from LWHC and $1,493,000 from FWHC.[4] The firms were not parties to the consent judgment and it did not include any agreement for Mr. Rajala to recover fees paid to them. But recovery from the holding companies proved illusory, and Mr. Rajala claims he has not recovered any of the LWHC funds "from any source."

## 5. Proceedings against the Firms

In March 2018, Mr. Rajala filed complaints against the firms, asserting a claim for $722,566 against Spencer Fane and a claim for $1,343,750 against Husch Blackwell, plus attorney fees and litigation costs. The firms moved to dismiss, and the bankruptcy court denied the motions on August 14, 2019. Specifically, the bankruptcy court reasoned that the firms were transferees of proceeds that LWHC derived from the fraudulent transfer described in the consent judgment.

Upon the firms' motions, the bankruptcy court certified its order denying the motions to dismiss for an interlocutory appeal. We agreed to hear the appeals, and, on

---

[4] The insiders agreed to pay $850,000 to the Generation Resources estate.

9

October 22, 2019, the Clerk of Court procedurally consolidated appeal Nos. 19-3226 and 19-3227.

## II.    DISCUSSION

The question in these appeals is whether Mr. Rajala may recover the proceeds of the fraudulent transfer from the firms under 11 U.S.C. § 550. Because we conclude the firms are not "transferees," as that term is used in § 550, we hold § 550 does not give Mr. Rajala the power to recover the fees paid to the firms.

### A.    *Standard of Review*

"In reviewing a bankruptcy court decision[,] we apply the same standards of review as those governing appellate review in other cases." *In re Wes Dor, Inc.*, 996 F.2d 237, 241 (10th Cir. 1993) (quotation marks omitted). So, we review a bankruptcy court's denial of a motion to dismiss in an adversary proceeding de novo. *See In re M & L Bus. Mach. Co., Inc.*, 75 F.3d 586, 589 (10th Cir. 1996). "In ruling on a motion to dismiss for failure to state a claim, [a]ll well-pleaded *facts*, as distinguished from conclusory allegations, must be taken as true, and the court must liberally construe the pleadings and make all reasonable inferences in favor of the non-moving party." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017) (alteration in original) (internal quotation marks omitted).

### B.    *Section 550*

Section 550 states:

>    (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the

property transferred, or, if the court so orders, the value of such property, from—

>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

>> (2) any immediate or mediate transferee of such initial transferee.

> (b) The trustee may not recover under section (a)(2) of this section from—

>> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

>> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550.

To state a claim under § 550, a trustee must satisfy the statute's three separate requirements. First, a trustee must invoke a transfer that was avoided under one of the enumerated sections of the Bankruptcy Code. Second, a trustee must plausibly allege that he seeks to recover "the property transferred" or "the value of such property." Third, a trustee must plausibly allege that the defendants are either "the initial transferee," "the entity for whose benefit such transfer was made," or "any immediate or mediate transferee of such initial transferee." Here, Mr. Rajala's claim fails because neither of the firms is a transferee of the property transferred.

## 1. "The property transferred"

The first step in ascertaining the identity of the transferees is to pinpoint "the property transferred." Mr. Rajala's complaints identified the property transferred as

11

Generation Resources' "right and interest to be paid the Lookout sales proceeds." App., Vol. I at 38. Those proceeds included the right to repayment of sunk costs and the right to developer fees, as contemplated by the MOU, which is worth $9,941,448 according to the Pennsylvania district court judgment.

Section 550 empowers a trustee to recover "the property transferred," either from the initial transferee or subsequent transferees. Accordingly, we must identify the "property transferred." Importantly, the only time the word "transfer" appears in § 550 before the phrase "the property transferred" is in reference to the transfer that was "avoided." Therefore, the most natural reading of the phrase "the property transferred" is that it refers to the property fraudulently transferred in the first instance. Applying this interpretation here, "the property transferred" is Generation Resources' "right and interest to be paid the Lookout sales proceeds." App., Vol. I at 38.

## 2. "The initial transferee" and "any immediate or mediate transferee."

Before we can determine who qualifies as an "immediate or mediate transferee," we must identify the initial transferee. To determine the identity of the initial transferee, "[t]his circuit, like several others, has adopted a 'dominion and control' test." *In re Ogden*, 314 F.3d 1190, 1202 (10th Cir. 2002). "Under this approach, those who act as mere financial intermediaries, conduits or couriers are not initial transferees under § 550." *Id.* (internal quotation marks omitted).

Here, the initial transferee was LWHC. The transfer was the insiders' substitution of LWHC in place of Generation Resources as the designated recipient of the Lookout sales proceeds in the revised development agreement.

12

Due to that transfer, LWHC exercised sufficient dominion and control over the Lookout sales proceeds to qualify as a transferee. LWHC asserted a right to the Lookout sales proceeds in negotiations with Edison Capital. And LWHC successfully sued to obtain the portion of those sales proceeds that Edison Capital initially refused to pay.

Because LWHC is the initial transferee, the firms are subject to the trustee's powers under § 550 only if they qualify as an "immediate or mediate transferee" of the property.[5] When § 550 refers to an "immediate or mediate transferee," it means a "subsequent transferee." Robert E. Ginsberg et al., *Ginsberg & Martin on Bankruptcy* § 9.03 (5th ed. 2019).

The firms are not subsequent transferees because they never received the property transferred, *i.e.*, the contractual right to the Lookout sales proceeds. Generation Resources transferred that property to LWHC, and there is no allegation that LWHC further transferred the "right and interest to be paid the Lookout sales proceeds" to either of the firms or any third party who then transferred it to the firms. Accordingly, under the plain language of § 550, neither firm is a transferee of the property that was set aside as fraudulently transferred.

Mr. Rajala correctly points out that LWHC was able to obtain certain funds in satisfaction of its contractual right to the Lookout sales proceeds. Moreover, LWHC distributed some of those funds to the firms. So, there is no dispute that the firms received

---

[5] Mr. Rajala does not argue that either firm is "the entity for whose benefit [the avoided] transfer was made." *See* § 550(a)(1).

some property from LWHC. But—as we have explained—those funds are distinct from "the property transferred," which in § 550 refers only to that property that changed hands as part of the avoided transfer. Importantly, the firms never had any contractual right to the Lookout sales proceeds. Thus, they were not transferees of the relevant property.

To illustrate, if the property fraudulently transferred had been a viable claim against a third party—a chose in action—instead of the developer's contractual interest in the Lookout project, the trustee could recover the claim itself (or its value) from a subsequent transferee, but could not recover proceeds generated from reducing that claim to a money judgment that were then used to pay the attorneys who obtained the judgment. This is because § 550 limits the persons subject to the trustee's power to those who are transferees of the property fraudulently transferred, which in this hypothetical is the chose in action. Because the attorneys never received the chose in action, they are not transferees for purposes of § 550. Similarly, the firms here never received the contractual right fraudulently transferred from Generation Resources to LWHC. The firms are therefore not subsequent transferees of the property transferred. And to the extent Mr. Rajala's position is that cash proceeds are *always* part and parcel of "the property transferred," we explain below why that position is at odds with the text and structure of the Bankruptcy Code.

The bankruptcy court erred by conflating the question of whether the firms are subsequent transferees with the distinct question of whether it might be appropriate to collect the value of the property from a transferee when recovery of the property is no longer practical. Section 550 provides that a trustee may recover "the value" of

14

transferred property "if the court so orders." Whether the court issues such an order, however, has no bearing on the persons from whom the trustee may recover. Those persons are "the initial transferee," "the entity for whose benefit such transfer was made," or "any immediate or mediate transferee of such initial transferee." Because the firms are not transferees, Mr. Rajala may not invoke § 550 to recover the monies paid to the firms.

## C. *Section 541 Does Not Expand the Universe of Transferees.*

Mr. Rajala disagrees, pointing to the firms' receipt of payments that were derived from amounts Edison Capital paid to LWHC. Specifically, Mr. Rajala notes that after the court released the approximately $9 million in proceeds from the Lookout sales to LWHC, LWHC made payments to the firms. According to Mr. Rajala, these payments are recoverable as "proceeds" of "the property transferred."

Relying on section 541 of the Bankruptcy Code, Mr. Rajala claims that "proceeds" are part of the bankruptcy estate. 11 U.S.C. § 541(a)(6) (defining the bankruptcy estate, and expressly providing that "[p]roceeds" are a form of "property"). It follows, in Mr. Rajala's view, that when § 550 refers to "the property transferred," it must also include the proceeds of said property. And because the firms are the recipients of such proceeds, Mr. Rajala contends they can be forced to disgorge the payments under § 550. We disagree.

First, Mr. Rajala's position is at odds with the plain language of § 550. As discussed, § 550 permits the trustee to recover certain property from a limited group of persons. To fall within the class of persons subject to § 550, the party must be a transferee of the property that was fraudulently transferred. Here, that is the right to

15

proceeds from Lookout project sales. As discussed, neither of the firms are transferees of that right to payment. And nothing about § 541's definition of property expands the trustee's powers under § 550 to recover from persons who are not transferees.

Second, Mr. Rajala's position does not track the structure of § 541. Section 541 states that an "estate is comprised of all the following property," and then lists seven categories. As Mr. Rajala points out, the sixth category includes "[p]roceeds . . . of or from property of the estate." 11 U.S.C. § 541(a)(6). But the third category identified as property of the estate in § 541 is "[a]ny interest in property that the trustee recovers under section . . . 550 . . . of this title." 11 U.S.C. § 541(a)(3). As the firms argue, if proceeds were already available under § 550, there would be no reason to list them separately in § 541. The fact that the Code treats "[p]roceeds" as distinct from "property that the trustee recovers" under § 550 is strong evidence that the two species of property are different, at least in some respects.

Third, § 541 demonstrates that when Congress intended to include proceeds, it knew how to do so. Section 550 allows the trustee to follow the property fraudulently transferred and recover it, or its value. And it permits the trustee to recover only from transferees of the property. If its intent was to provide the trustee the power to trace proceeds derived from the property against any person who received those proceeds as payment for goods or services, Congress could have said so.

In summary, Mr. Rajala has not plausibly alleged that the firms are "immediate or mediate transferee[s]" of the property fraudulently transferred to LWHC. For that reason, Mr. Rajala has not plausibly alleged a valid § 550 claim against either of the firms. And

16

because each of Mr. Rajala's adversary complaints contained only a single claim for relief based on § 550, it follows that the bankruptcy court should have granted the firms' motions to dismiss.

### III.    CONCLUSION

For these reasons, we **REVERSE** and **REMAND** with instructions to the bankruptcy court to dismiss Mr. Rajala's adversary complaints against the firms.